RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KAREN HEETER, as administrator of the estate of Bill
G. Heeter, deceased; JONATHAN HEETER, individually
and as heir to the estate of Bill G. Heeter, deceased;
STEPHANIE HEETER, individually and as heir to the
estate of Bill G. Heeter, deceased; BRANDON HEETER,
individually and as heir to the estate of Bill G. Heeter,
deceased,

> No. 23-3296

       *Plaintiffs-Appellees*,

  *v.*

KENNETH BOWERS, individually and in his capacity as
an employee of the City of Columbus, Ohio;
COLUMBUS POLICE DEPARTMENT,

       *Defendants-Appellants*.

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-06481—Algenon L. Marbley, Chief District Judge.

Argued: February 1, 2024

Decided and Filed: April 29, 2024

Before: SUTTON, Chief Judge; CLAY and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Alana V. Tanoury, CITY OF COLUMBUS, Columbus, Ohio, for Appellants. Louis E. Grube, FLOWERS & GRUBE, Cleveland, Ohio, for Appellees. **ON BRIEF:** Alana V. Tanoury, Alexandra N. Pickerill, CITY OF COLUMBUS, Columbus, Ohio, for Appellants. Louis E. Grube, FLOWERS & GRUBE, Cleveland, Ohio, for Appellees.

   BLOOMEKATZ, J., delivered the opinion of the court in which SUTTON, C.J., joined. CLAY, J. (pp. 30–37), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

BLOOMEKATZ, Circuit Judge. On the morning of November 21, 2018, the day before Thanksgiving, Bill Heeter told his wife Karen he was about to commit suicide. Mr. Heeter's brother called the police to stop him. At about 10:05 a.m., officers began to arrive at the family's Columbus, Ohio home. They spotted Mr. Heeter through his kitchen window—he was sitting at a table smoking a cigarette, with one hand on his pistol. He told the officers he'd put his gun away if they left. At approximately 10:15 a.m., a group of officers entered the house with their weapons drawn. At 10:17 a.m., Officer Kenneth Bowers fired five rounds from his M16 service rifle into Mr. Heeter's chest. At 10:57 a.m., Mr. Heeter was pronounced dead at the hospital. Police bodycam footage captured almost everything that happened. It shows that a police sergeant called the paramedics. It also shows that Officer Bowers did not administer first aid or otherwise try to help Mr. Heeter while waiting for the paramedics to arrive, even though Mr. Heeter was audibly and visibly alive, hemorrhaging blood, and struggling to breathe.

The Heeters' three children and their mother (as the representative of Mr. Heeter's estate) sued Officer Bowers and the Columbus Police Department (a subdivision of the City of Columbus) for civil rights violations under 42 U.S.C. § 1983 and for violations of state tort law. Officer Bowers and the City asserted that qualified immunity and Ohio statutes meant they could not be sued. Based on careful review of the video, the district court granted the defendants immunity from some claims but denied others.

The two constitutional claims against Officer Bowers that survived qualified immunity in the district court are the central focus of this appeal. *First*, the Heeters claim that Officer Bowers used excessive force in violation of the Fourth Amendment when he shot and killed Mr. Heeter. *Second*, the Heeters claim that Officer Bowers violated Mr. Heeter's Fourteenth Amendment right to adequate medical care while in police custody because he stood idle after the paramedics were called, rather than provide the emergency first aid Mr. Heeter obviously needed.

We conclude, contrary to the Heeters' motion to dismiss this appeal, that we have jurisdiction to review both claims. On the merits, we affirm the district court's denial of state-law immunity and qualified immunity as to Officer Bowers in his individual capacity, so the Heeters' constitutional and state-law claims against him may proceed to trial. But, just as the district court held that the City was entitled to summary judgment on the federal claims, the City was also entitled to summary judgment on the state-law claims because of an Ohio municipal immunity statute. We reverse solely on the issue of municipal immunity for the City, and otherwise affirm.

## BACKGROUND

### I. Factual Background

Bill and Karen Heeter lived together in the Franklinton neighborhood of Columbus, Ohio with their three children: twenty-one-year-old Jonathan, nineteen-year-old Jennifer, and seventeen-year-old Brandon.

Kenneth Bowers is an officer with the Columbus Police Department, and in November of 2018 had just completed his twenty-first year of service. Through the course of his career, Officer Bowers received training in basic first aid, de-escalation, interacting with persons in mental health crises, and crisis intervention. The other officers most relevant to the appeal are Sergeant Steven Redding, Officer Linda Gibson, and Officer Robert Bruce.

#### A. The Heeters' Calls to the Police

Around 9:00 a.m. on November 21, 2018, either Ms. Heeter or Mr. Heeter's brother called Franklin County 911 Dispatch because Mr. Heeter was threatening to jump in front of a bus. Sergeant Redding and several other officers drove to the Heeters' house in response to this call. On the scene, Ms. Heeter told the officers that Mr. Heeter had attempted suicide before, and that he had threatened to shoot himself the prior evening but that she had been able to get his gun away from him. When the officers couldn't locate Mr. Heeter, they left.

About an hour later, Mr. Heeter's brother called 911, reporting that Mr. Heeter was back in the house, armed with a gun, threatening to shoot himself, and in need of "someone to talk

him down before he gets hurt." Dispatch Log, R. 21-3, PageID 153. About two minutes into the call, the brother started to cry and told the dispatcher, "Please don't shoot him." *Id.*

## B. The Police Response

The footage from three of the responding officers' body-worn cameras depicts much of the police response to this second call. *See* Bowers Footage, R. 21-2; Bruce Footage, R. 21-7; Redding Footage, R. 21-12. Officer Bowers, Sergeant Redding, Officer Bruce, and Officer Gibson arrived at the scene in quick succession. They knew from the 911 dispatch report that Mr. Heeter was armed, suicidal, and sitting in his dining room. They also knew that Mr. Heeter had not threatened to harm anyone else in the home.

Officer Bowers arrived first. He unracked his M16 service rifle, exited his police cruiser, then armed and aimed his rifle as he walked towards the Heeter residence. The other officers approached with their handguns holstered. After the officers surveyed the house for a few minutes, Ms. Heeter announced herself and walked out of the house onto the front porch. She told the officers that the couple's three children along with her niece (twenty-six-year-old Brittany) were upstairs and in the basement of the home. She also confirmed to the officers that Mr. Heeter was still sitting at the dining table alone and said he "would put the gun up if you guys just leave." Redding Footage, 2:45–3:15. Officer Bowers responded, "We can't take that chance—we're going home tonight, okay?" *Id.*

After Ms. Heeter walked out to the street, Sergeant Redding and Officers Bowers, Bruce, and Gibson approached the front door of the home, through which they could see Mr. Heeter seated at the dining table and smoking a cigarette. A handful of officers, including Gibson and Bruce, clustered with Bowers by the front door. Sergeant Redding stationed himself near a window on the porch where he could see Mr. Heeter more fully, and from there he relayed his view of Mr. Heeter to the officers at the front door. He relayed that Mr. Heeter had a gun in his right hand pointed down at the floor. The officers repeatedly ordered Mr. Heeter to drop his gun and exit the house with his hands up so they could get him help. Mr. Heeter occasionally responded by asking the officers to leave and telling them he'd put his gun away if they did.

After several minutes, Mr. Heeter stood up from the table and moved into the corner. In response to this movement, Sergeant Redding ordered Mr. Heeter again to put the gun down and come outside, warning him that he would be shot if he aimed his gun at the officers. Sergeant Redding then relayed to the other officers that Mr. Heeter had put his gun on the table and said, "You guys ready? We're gonna move in and take him before he gets that." Bruce Footage at 9:45–10:10.

Officers Bowers, Bruce, and Gibson then walked quickly into the home with weapons drawn, stopping so they stood in the archway to the dining room. Officer Bowers stood with his rifle aimed at Mr. Heeter. Sergeant Redding and a handful of other officers followed and stood behind. Mr. Heeter side-stepped so he better faced the officers. The officers in the archway tried for about a minute to persuade Mr. Heeter to drop his gun and raise his hands. Mr. Heeter stood still with his hands in his pockets.

Mr. Heeter largely remained silent as the officers instructed him several times to walk away from the table with his hands up. After some time, Mr. Heeter said, "You know, you guys are really starting to piss me off." Redding Footage at 10:45–10:50. An officer responded, "Just show us your hands, we'll get you some help." *Id*. at 10:50–11:11. Mr. Heeter replied, "I don't want no help . . . I just want you guys to just go out, I'll put my gun up, and I won't touch it no more." *Id*. One officer responded, "No, it doesn't work that way, Bill," and another chimed in, expressing that they did not want anyone to get hurt. *Id.* Mr. Heeter stood with his hands in his pockets for the entirety of this exchange.

The bodycam footage of the moments that followed is partially obscured—we can see the left side of Mr. Heeter's body, including his left hand. And while Sergeant Redding told the officers he saw Mr. Heeter put his gun onto the table, the video does not definitively resolve where the gun was: the Heeters' two black cats and other scattered objects obscure a clear view of the table.

We can see from the footage that Mr. Heeter took one or two side-steps to his left. As Mr. Heeter began these movements, Officer Bowers asked, "Where's the gun? I see the cat." Bruce Footage at 11:25–11:40. Mr. Heeter took his left hand out of his pants pockets and started

to move his torso toward the floor with nothing in his left hand. We cannot see his right hand. As he moved slightly, an officer started to say "Bill—." *Id*. Officer Bowers then pulled the trigger of his M16 rifle and delivered five shots to Mr. Heeter's chest in quick succession. Mr. Heeter immediately collapsed to the floor face down.

**C. After the Shooting**

Immediately after the shooting, Sergeant Redding said that Officer Bowers "had point." Bruce Footage at 11:30–13:00. Then, about 25 seconds after the shooting, Sergeant Redding radioed to report the shooting and call for paramedics. Meanwhile, Officer Bowers walked up to Mr. Heeter—who was still collapsed face down on the floor—and asked him to show his hands. Mr. Heeter didn't move. Officer Bowers then ordered Officer Bruce to handcuff Mr. Heeter, but said that before he did, he should put on protective rubber gloves. After retrieving and donning his gloves, Officer Bruce pulled Mr. Heeter's hands behind his back to cuff him. As he did, Mr. Heeter began to audibly moan. Blood had pooled on the floor below Mr. Heeter and had gotten on his hands. Meanwhile, Officer Bowers continued to command Mr. Heeter to show the officers his hands.

The bodycam footage then shows Officer Bowers engaged in largely non-verbal communications with the other officers in the room. We can see they made eye contact and exchanged various hand signals in silence. Office Bruce gave Officer Bowers a thumbs up, seeming to ask if he was okay. At one point, Officer Bowers appears to have been reenacting how he shot Mr. Heeter, as he raises his rifle again. At other points, Officer Bowers walked in and out of the room, then stood with his hand on his hip in the corner. No one was attending to Mr. Heeter, who was bleeding profusely and struggling to breathe.

After several minutes, Sergeant Redding confirmed that Officer Bowers was the only officer "involved" in the shooting. Bruce Footage at 12:30–14:25; Redding Footage at 12:20–14:30. Sergeant Redding said that Officer Bowers "saved everybody," and Officer Bruce reassured Officer Bowers, "Don't even think about it." *Id*. Sergeant Redding then instructed Officer Bowers to leave the room; he quickly complied. When Officer Bowers left the room, about three minutes had passed since he shot Mr. Heeter. The other officers then approached

Mr. Heeter and heard him cough and gasp for air. So much blood had accumulated below his head and body in this time that Officer Bruce suggested Sergeant Redding pull Mr. Heeter's nose out of the puddle so he could breathe.

The paramedics appeared about eight-and-a-half minutes after the shooting. Mr. Heeter remained cuffed. Once they arrived, the medics immediately turned Mr. Heeter onto his back. After they detected electrical activity in Mr. Heeter's heart, they began to administer CPR. The paramedics transported Mr. Heeter to the hospital, where he was pronounced dead at 10:57 a.m.

## II. Procedural History

Ms. Heeter (in her capacity as the administrator of Mr. Heeter's estate), along with Jonathan, Stephanie, and Brandon (as individuals and heirs to the estate), brought this action in the Franklin County Court of Common Pleas against Officer Bowers in his individual and official capacities and the Columbus Police Department. As relevant here, the family asserted claims under 42 U.S.C. § 1983 against Officer Bowers for violating Mr. Heeter's Fourth and Fourteenth Amendment rights by using excessive force against him, and for violating his Fourteenth Amendment right to receive adequate medical care while in custody. The family also asserted state-law assault and battery claims against Officer Bowers, and a wrongful death claim against Bowers and the department.

Officer Bowers and the Columbus Police Department removed the case to the United States District Court for the Southern District of Ohio. The defendants moved for summary judgment, arguing they were entitled to qualified immunity on the federal claims and statutory immunity on the state-law claims. Officer Bowers's defense rested largely on his own affidavit, in which he asserted that he shot Mr. Heeter because he perceived Mr. Heeter's "tone of voice to be very cold and somewhat angry," he had "his right hand and fingers formed in a 'grip,' as if he was holding or grabbing the butt of a pistol," and he then "quickly pulled his right hand from his pocket" and "quickly stepped forward while bending at the waist or crouching." Bowers Aff., R. 21-1, PageID 144–46 ¶¶ 26, 29–30. He claims this caused him to be "in fear for [his] life and the lives of the other officers at that moment." *Id.* at PageID 146 ¶ 30.

The district court denied summary judgment on the excessive force, adequate medical care, and state-law claims against Officer Bowers in his individual capacity. The district court, reviewing the bodycam footage and other record evidence, concluded there were genuine disputes of material fact as to whether Mr. Heeter had a gun on his person and whether he "lunged" or otherwise appeared to be threatening the officers before Officer Bowers shot him. Op. & Order, R. 37, PageID 342, 345–46. These factual disputes precluded summary judgment on the excessive force claim. The district court also concluded that based on Officer Bowers's actions after the shooting, a jury could find that he violated Mr. Heeter's clearly established right to adequate medical care. And because Officer Bowers was not entitled to qualified immunity at summary judgment, the district court concluded he was also not entitled to Ohio's statutory immunity for municipal employees or to summary judgment on the state-law claims. The court granted summary judgment for the Columbus Police Department on all the federal claims against it but denied municipal immunity under Ohio law.

The defendants timely appealed.

## QUALIFIED IMMUNITY

We review de novo the district court's order denying Officer Bowers summary judgment on his qualified immunity defense. *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 314 (6th Cir. 2023). A public official is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate "clearly established . . . constitutional rights of which a reasonable person would have known." *Jackson v. City of Cleveland*, 64 F.4th 736, 745 (6th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (cleaned up). The official is entitled to summary judgment unless a "genuine dispute of material fact" precludes the defense. Fed. R. Civ. P. 56(a); *see Wilkerson v. City of Akron*, 906 F.3d 477, 481 (6th Cir. 2018). Once the official has asserted a qualified immunity defense, the plaintiff must show that (1) the official violated his constitutional rights, and (2) at the time of the violation, it was "clearly established" that the officer's conduct would violate the Constitution. *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2023). We may answer those questions "in any order." *Jackson*, 64 F.4th at 745.

At issue on appeal are the two constitutional claims that survived qualified immunity in the district court: (1) that Officer Bowers violated Mr. Heeter's Fourth Amendment right by using excessive force; (2) that Officer Bowers violated Mr. Heeter's Fourteenth Amendment right to receive adequate medical care while detained. We first address our appellate jurisdiction, then evaluate each claim separately.

## I. Appellate Jurisdiction

Before reaching the merits, we must first confirm that we have jurisdiction over Officer Bowers's appeal. *See, e.g.*, *Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020). An order denying summary judgment is not typically a "final decision" that we have jurisdiction to review under 28 U.S.C. § 1291. *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). But we treat denials of qualified immunity a bit differently. When a defendant official is entitled to qualified immunity (or Ohio statutory immunity), it means they are entitled to not stand trial for their actions. *Id.* at 771–72; Ohio Rev. Code § 2744.02(C). A summary-judgment order denying this immunity from suit is essentially a final order as to that entitlement. That denial is separate enough from the underlying merits to warrant immediate appeal under the collateral order doctrine. *Plumhoff*, 572 U.S. at 771–72; *see also Mitchell v. Forsyth*, 472 U.S. 511, 527–30 (1985). At least for some appeals.

We have jurisdiction to review these interlocutory decisions "only to the extent" the appeal "turns on an issue of law." *Adams*, 946 F.3d at 948; *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (quoting *Mitchell*, 472 U.S. at 530) (emphasis omitted). We have no power of review where the officer's appeal is based on a quarrel with the plaintiff's record-supported facts, which the district court must adopt at summary judgment. *E.g.*, *Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023) ("[I]n this appeal, the facts are everything. So we lack jurisdiction.").

This fact-law distinction stems from the Supreme Court's decision in *Johnson v. Jones*, 515 U.S. 304 (1995). In *Johnson*, the Court considered an appeal of officers sued for using excessive force. *Id.* at 307. Some of the officers argued they were entitled to summary judgment because they weren't even present when the force was used. *Id.* at 307–08. The district court disagreed: there was "potential liability" under the plaintiff's story that "the three officers stood

by and allowed others to beat the plaintiff," and the record contained "sufficient circumstantial evidence" that a jury could believe that story was true. *Id.* at 308 (cleaned up). On appeal, because the officers continued to fight the facts and would not accept the district court's view of the record, the Seventh Circuit dismissed the case for lack of appellate jurisdiction. *Id.* at 313. The Supreme Court affirmed, holding that our appellate jurisdiction to review qualified immunity denials does not extend to disputes about "evidence sufficiency," which ask us to determine "which facts a party may, or may not, be able to prove at trial." *Id.* We may only review the "purely legal" issue of whether the facts "support a claim of violation of clearly established law." *Id.* (quoting *Mitchell*, 472 U.S. at 528 n.9).

Adhering to *Johnson*, we have consistently declined to exercise jurisdiction over appeals where the officer's dispute of facts is "crucial to" the appeal. *Adams*, 946 F.3d at 951 (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)); *see also*, *e.g.*, *McGrew v. Duncan*, 937 F.3d 664, 669–70 (6th Cir. 2019) (dismissing fact-bound appeal for lack of appellate jurisdiction); *Anderson-Santos v. Kent Cnty.*, 94 F.4th 550, 554–55 (6th Cir. 2024) (same). And a defendant "may invoke our jurisdiction by conceding" the district court's version of the facts, as construed in the light most favorable to the plaintiff. *Anderson-Santos*, 94 F.4th at 554 (citing *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998); *Moldowan v. City of Warren*, 578 F.3d 351, 369–70 (6th Cir. 2009)). By adopting that version of the facts, "we may decide the legal question of whether qualified immunity is warranted." *Raimey v. City of Niles*, 77 F.4th 441, 448 (6th Cir. 2023).

Deciphering whether an officer's appeal challenges "evidence sufficiency" or is "purely legal" sounds much easier than it often is. *Johnson*, 515 U.S. at 313 (quoting *Mitchell*, 472 U.S. at 528 n.9). In part, that is because "it is impossible to know which 'clearly established' rules of law to consult unless you know what is going on." *Elliott v. Thomas*, 937 F.2d 338, 342 (7th Cir. 1991) (cleaned up). Indeed, our review of summary judgment decisions outside the qualified immunity context—which we review de novo as "legal" determinations—frequently entails entwined questions of fact and law and whether the district court properly construed the record as Rule 56 dictates. *See*, *e.g.*, *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). Determining where an interlocutory challenge to a qualified immunity denial lands on this fact-

law spectrum, as we must, is a contentious issue. *Compare Williams v. Mehra*, 186 F.3d 685, 689–90 (6th Cir. 1999) (en banc) (asserting jurisdiction over interlocutory appeal to review a "mixed" question, characterized as "an issue of ultimate fact as distinguished from subsidiary or basic fact"), *with id*. at 695–96 (Merritt, J., dissenting in part) (criticizing majority's analysis of appellate jurisdiction question as "not what the Supreme Court had in mind when it decided *Johnson v. Jones*"). *See also Barry v. O'Grady*, 895 F.3d 440, 444 (6th Cir. 2018) (concluding that appellate jurisdiction was lacking, over a dissent, because what the defendants called legal arguments were really about the facts). Our sister circuits also struggle to apply and have criticized the *Johnson* standard. *See Est. of Anderson v. Marsh*, 985 F.3d 726, 735 (9th Cir. 2021) (Fletcher, J., dissenting) (collecting cases and emphasizing that "the law in this area is extraordinarily confused").

Adding to the difficulty, the Supreme Court has forgone numerous opportunities to clarify *Johnson* by not discussing or explaining it in subsequent cases involving appeals from district court denials of qualified immunity at summary judgment. *See Barry*, 895 F.3d at 445 (Sutton, J., dissenting) (citing *Plumhoff*, 572 U.S. 765; *Scott v. Harris*, 550 U.S. 372 (2007)); *Marsh*, 985 F.3d at 739–42 (Fletcher, J., dissenting) (citing *Saucier v. Katz*, 533 U.S. 194 (2001); *Scott*, 550 U.S. 372; *Plumhoff*, 572 U.S. 765; *Mullenix v. Luna*, 577 U.S. 7 (2015); *White v. Pauly*, 580 U.S. 73 (2017)). A particularly thorny question is how to properly square *Johnson* with the Supreme Court's decision in *Scott v. Harris*, which reversed a district court's denial of summary judgment as "blatantly contradicted by the record," but did not discuss appellate jurisdiction whatsoever. 550 U.S. at 380. We have attempted to reconcile the cases in various ways. *See, e.g.*, *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018) (characterizing whether district court's factual determination is "blatantly" wrong as a "legal question" reviewable on interlocutory appeal); *Barry*, 895 F.3d at 443 (characterizing same inquiry as an "exception" to *Johnson*). *But see Barry*, 895 F.3d at 445 (Sutton, J., dissenting) (criticizing majority's reading of *Scott* to permit only some evidentiary challenges on interlocutory review as "terribly confusing" and "not a rule"); *see also Raimey*, 77 F.4th at 447 (explaining that when the record contains a video, *Scott* constrains the facts we may "adopt" on appeal). Even though *Scott* does not cite *Johnson*, it—like all the Supreme Court's post-*Johnson* cases—is still binding on our court.

Parsing this precedent, we conclude that we have jurisdiction to review both constitutional claims Officer Bowers appeals. Here, the bodycam footage accurately depicts most of the relevant events. We may view the facts "in the light depicted by the videotape" and use it to ensure the district court properly constructed the factual record. *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017) (quoting *Scott*, 550 U.S. at 381). And the video resolves many of the factual disputes. *Cf. Scott*, 550 U.S. at 381 (using video to resolve disputed facts and reject district court's factual determinations on interlocutory qualified immunity review); *Rudlaff v. Gillispie*, 791 F.3d 638, 639, 642 (6th Cir. 2015) (same); *LaPlante*, 30 F.4th at 576 n.8 (using video to resolve disputed fact). As we will discuss, it allows us to reject Officer Bowers's contention that the factual determinations underlying the district court's excessive force decision were "blatantly contradicted by the record," as they were in *Scott v. Harris*. Opp'n Mot. Dismiss App. at 3, 5, 10 (quoting *Scott*, 550 U.S. at 380). It also gives us a clear view of what happened after Officer Bowers shot Mr. Heeter, thus providing an uncontroverted set of facts for the Fourteenth Amendment medical-care claim.

Because we can conduct our legal analysis based on the video and the undisputed facts, this appeal is not about "evidence sufficiency." *See Johnson*, 515 U.S. at 313. This is not a case involving dueling affidavits where the defendants, denied qualified immunity below, rest their appellate arguments entirely on a version of the facts that would absolve them of liability. *See Berryman*, 150 F.3d at 563–64 (dismissing appeal where the defendants' argument "boil[ed] down to credibility determinations" about which affidavits the court was to believe); *Anderson-Santos*, 94 F.4th at 555 (explaining that a defendant who would not concede to the plaintiff's description of the magnitude of and intent behind an officer's use of force "fail[ed] to present us with a legal issue"). In those instances, the dispute was not about whether the defendant's conduct—as alleged by the plaintiff or determined by the district court—violated clearly established law. The question for us to answer was: What happened? Here, on the other hand, we know what happened because we can watch the video.

For the singular contested fact we cannot discern from the video—the location of the gun—Officer Bowers is willing to accept for purposes of appeal the district court's determination that, viewing the record in the light most favorable to the Heeters, a jury could

find it was on the table. To the extent this factual dispute was "crucial" to Officer Bowers's appeal, his concession allows us to resolve the legal issues he has raised—which are the bases of our interlocutory appellate jurisdiction—while allowing the parties to keep their factual disputes on ice for potential resolution at trial. *Adams*, 946 F.3d at 948, 951; *see also Mehra*, 186 F.3d at 690 (finding jurisdiction when the defendants "admitted" to the plaintiff's facts "for purposes of this appeal"). Indeed, Officer Bowers argues he is entitled to qualified immunity under either version of the facts—if the gun was in Mr. Heeter's pocket or on the table. He's wrong, but the video and this concession mean we have jurisdiction over both of Officer Bowers's claims because we can set aside factual quarrels and determine whether he violated clearly established law. That question is "the precise scope of our appellate jurisdiction on interlocutory appeal from a denial of qualified immunity." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277–78 (6th Cir. 2020). We therefore proceed to the merits.

## II. The Fourth Amendment Excessive Force Claim

Officer Bowers challenges the district court's decision to deny him qualified immunity on the excessive force claim. We begin by addressing the relevant facts that apply to this claim, then analyze whether he violated clearly established law.

### A. Mr. Heeter's Final Actions

Our "first step" in reviewing the constitutionality of Officer Bowers's use of force is "to determine the relevant facts" for our analysis. *Scott*, 550 U.S. at 378. As we mentioned earlier, Officer Bowers argues that our general *Johnson*-based rule that we do not review the facts on interlocutory appeal does not apply here because the district court's construction of the facts was so "blatantly contradicted by the record" that we should use his version of the facts instead. Opp'n Mot. Dismiss App. at 5, 10 (quoting *Scott*, 550 U.S. at 378). Specifically, he challenges the district court's conclusion that there were genuine factual questions as to whether Mr. Heeter lunged at the officers or whether "the gun was in Mr. Heeter's pocket or on the table." Appellant Br. at 23–24. Officer Bowers says that the record conclusively establishes that Mr. Heeter was lunging at him while pulling a gun out of his pocket. The record belies both assertions.

We easily dismiss the assertion that Mr. Heeter lunged at the officers just by watching the video.  The part of Mr. Heeter's body that is visible in the footage made a slight downward movement towards the floor, not an abrupt lunge towards the officers.  From watching this footage, a reasonable jury could believe that it was not a lunge or other threatening movement. We don't need more to reject Officer Bowers's construction, but we have more from a fellow officer who testified that Mr. Heeter "made a movement, like he was going to lean forward." Gibson Aff., R. 21-8, PageID 178 ¶ 12.  Not that he lunged.

Likewise, the district court properly determined a jury could find that Mr. Heeter was not pulling a gun out of his pocket or aiming it at the officers.  The officers entered the Heeter residence specifically because Sergeant Redding told them Mr. Heeter had put his gun down on the dining table.  After that, the video doesn't show where Mr. Heeter's gun was; it certainly does not show the outline of a gun in Mr. Heeter's pocket, as Officer Bowers claims it does.  It just shows Mr. Heeter standing with his hands in his pockets.  None of the other officers affirmed that they saw an outline of a gun in Mr. Heeter's pocket or that they saw him holding a gun.  All of these facts support, rather than contradict, the district court's construction of the record.

Moreover, we reject Officer Bowers's assertion that we must accept uncritically all the allegations in his affidavit because the video does not show the right side of Mr. Heeter's body and there is no other affidavit (for instance, from the deceased) to contradict his.  To do so would sidestep our obligation to construe "gaps or uncertainties" in the videos in the Heeters' favor. *Latits*, 878 F.3d at 544.  While we sometimes credit police affidavits when nothing contradicts them, even on review of a denial of summary judgment, *e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 904–05 (6th Cir. 2009), here the bodycam footage is enough to call Officer Bowers's allegations into question.  In a sense, the bodycam footage takes the place of what would in happier circumstances be testimony of Mr. Heeter. *See Adams*, 946 F.3d at 949.  "In cases where the witness most likely to contradict the officer's testimony is dead," we will not "simply accept" the officer's "self-serving account." *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)) (alteration omitted).  Had Mr. Heeter survived the shooting, he might have been able to explain his actions and perhaps contradict the defendants' assertion that he was reaching for his

gun. *See Jefferson v. Lewis*, 594 F.3d 454, 461–62 (6th Cir. 2010) (affirming denial of summary judgment when the plaintiff lived to contradict the police officer's version of the events before the shooting).

It is true that, following *Scott*, we have used video footage to depart from the district court's factfinding when reviewing denials of qualified immunity. *See Rudlaff*, 791 F.3d at 639–40. But Officer Bowers's argument asks us to flip *Scott* on its head to use self-serving affidavits to contradict (or, at best, fill holes) in a video. We reject such a challenge and conduct our legal analysis with the record as shown in the video and as construed by the district court in the Heeters' favor.

**B. Fourth Amendment Violation**

We next determine whether a reasonable jury could find Officer Bowers violated Mr. Heeter's Fourth Amendment rights by using excessive force. The Fourth Amendment prohibits officers from using more force than is "objectively reasonable" under the circumstances. *Palma*, 27 F.4th at 428 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (cleaned up). Officer Bowers used deadly force, shooting Mr. Heeter five times with an assault rifle. That was unconstitutional unless Officer Bowers had "probable cause to believe" Mr. Heeter "posed a significant threat of death or serious physical injury" to the officers in the room. *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)) (alteration omitted). We evaluate Officer Bowers's actions from the perspective of a reasonable officer in his position, recognizing that he made the "split-second" decision to shoot Mr. Heeter without the benefit of hindsight. *Raimey*, 77 F.4th at 448 (citation omitted). In making our determination, we may consider why the officers were called to the Heeter residence as well as whether Mr. Heeter's words or actions show he resisted, disobeyed, or otherwise acted aggressively towards the officers. *See Palma*, 27 F.4th at 432; *Wilkerson*, 906 F.3d at 482.

Consider what we can see from the video: The officers knew they had been called to the home because Mr. Heeter was suicidal and armed. When they arrived, Mr. Heeter was sitting alone at a table smoking a cigarette. While there may have been a concern of self-harm, Mr. Heeter did not tell the officers in his home he intended to shoot his family or any of the officers.

While not dispositive, that Mr. Heeter had not acted aggressively towards the officers and had not committed a crime suggests the use of deadly force against him was unreasonable. *See Palma*, 27 F.4th at 432–33, 434–35.

Eventually, Mr. Heeter put his gun down and asked the officers to leave. A group of officers then walked inside with their guns drawn; Officer Bowers had his large assault rifle at his shoulder. In response, Mr. Heeter stood up and took a few steps toward the wall to retreat from the officers. Just after an officer asked him to "show us your hands," Mr. Heeter began to take his hands out of his pockets and started some sort of movement toward the ground. Redding Footage at 10:50–11:11. It was at this moment that Bowers shot Mr. Heeter.

A jury could find these actions would indicate to a reasonable officer that Mr. Heeter was not threatening to the officers in the room; indeed, they could indicate that Mr. Heeter was beginning to comply with officer instructions. One of the officers reacted to Mr. Heeter's movements by starting to talk to him; his words got cut off by the five shots from Officer Bowers's rifle. And none of the other officers fired their weapons. Since a jury could find a reasonable officer would not have perceived Mr. Heeter to pose a deadly threat, Officer Bowers is not entitled to summary judgment on the excessive force claim. *See Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 480 (6th Cir. 2022).

Officer Bowers's various counterarguments are unavailing. *First*, Officer Bowers asks us to focus on the parts of the video which show Mr. Heeter was not following the officers' commands to exit the house, to put his gun down, or to raise his hands. Mr. Heeter's disobedience and words of frustration that the group of armed officers in his home were "really starting to piss [him] off" indicated that the situation was tense. Redding Footage at 10:45–10:50. But "the mere failure of a citizen—not arrested for any crime—to follow the officer's commands" does not give the officer probable cause to use *deadly* force against him. *Palma*, 27 F.4th at 434 (quoting *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017)) (cleaned up).

*Second*, Officer Bowers argues that it was reasonable under the circumstances to think Mr. Heeter's gun was on his person, regardless of whether that was true. He emphasizes that our precedent sometimes excuses an officer who has misperceived a suspect to pose an immediate

threat of serious harm, especially when, as here, the suspect is just a few feet from the officers and could quickly raise and fire a weapon. *See Thomas*, 854 F.3d at 366. The video shows that Bowers did not have a full view of the table—it was obscured by clutter and the Heeters' two black cats. So, whether the gun was in Mr. Heeter's pocket or on the adjacent table, Officer Bowers emphasizes that it was in reach.

While it may have been reasonable for Officer Bowers to believe the weapon was within reach, whether it was also reasonable for him to believe Mr. Heeter would *use* his weapon against the officers is a different—and critical—question. That's because, as we have repeatedly stressed, an officer does not have probable cause to use deadly force against a suspect just because he is armed. *Palma*, 27 F.4th at 443; *Thomas*, 854 F.3d at 366. Something else about the situation must have reasonably indicated to Officer Bowers not only that Mr. Heeter was armed, but that he planned to shoot the officers or otherwise posed a serious threat to their safety. *Campbell*, 47 F.4th at 480. Here, Officer Bowers hasn't shown that, viewing the facts in the light most favorable to the plaintiffs, it was "objectively reasonable" for him to have "failed . . . to properly assess the reality of the situation." *Floyd v. City of Detroit*, 518 F.3d 398, 408 (6th Cir. 2008) (alteration omitted). To be sure, he may try to get a jury to agree with him. But on these summary-judgment facts, it was unreasonable for Officer Bowers to mistake a slight movement from a suicidal man who had not expressed an intent to harm anyone else as a threat of serious or deadly harm.

*Third*, Officer Bowers asserts that, as a matter of law, we cannot consider the fact that the other officers did not fire their weapons. Not so. Officer Bowers cites to *Jordan v. Howard*, but in that case we determined the conduct of another officer was irrelevant because that officer had a different perspective from the ones who fired the shots. 987 F.3d 537, 547 (6th Cir. 2021). This situation more closely tracks *Brandenburg v. Cureton*, which involved three officers who stood in close proximity to each other. 882 F.2d 211, 215 (6th Cir. 1989). We reasoned there that given the similar perspectives of the three officers, "the jury might reasonably consider why the two other officers did not fire shots if it was quite obvious that they were being threatened with imminent bodily harm." *Id*. So too here. As the body camera footage depicts, Officer Bowers stood nearly shoulder-to-shoulder with two other officers. That neither thought it

appropriate to fire at Mr. Heeter cuts against Officer Bowers's assertion that he reasonably perceived an imminent threat.

*Lastly*, Officer Bowers points to various precedents he believes show he did not use excessive force. Those cases, however, involve undisputed facts that would indicate to a reasonable officer that the suspect posed a threat to the lives of others at the scene. *See Campbell*, 47 F.4th at 480. A rape suspect who had crashed after leading officers on a dangerous highway car chase, for example, gave officers probable cause to use deadly force against him when he repeatedly gestured as if he was going to shoot at them from the wreckage. *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015); *see also Lemmon v. City of Akron*, 768 F. App'x 410, 415–16 (6th Cir. 2019) (armed robbery suspect fled from pursuing officers, dared them to shoot him, and reached for his waistband); *Jordan v. Howard*, 987 F.3d 537, 543–44 (6th Cir. 2021) (suspect swung his gun at the officers); *Tucker v. Marquette County*, No. 20-1878, 2021 WL 2828027, at *1, *3–4 (6th Cir. July 7, 2021) (suspect repeatedly shouted "shoot me!" as he walked towards officers while holding a shotgun); *Cooper v. City of Columbus*, No. 22-3251, 2023 WL 1434055, at *6–7 (6th Cir. Feb. 1, 2023) (suspect reached for his gun while wrestling another officer). The cases exemplify the types of aggressive escalations and threatening behavior that we have held lead a reasonable officer to perceive a risk of serious or deadly harm. Mr. Heeter's slight movements shown in the bodycam footage don't even come close. If they did, there would have been no way for him to comply with the officers' instructions without giving them probable cause to shoot him. We reject such a rule.

## C. Clearly Established Law on Excessive Force

The next step of the qualified immunity analysis asks us to determine whether the law was clearly established at the time of the violation. We ask whether any reasonable officer on that November morning would have objectively and "clearly understood that he was under an affirmative duty to have refrained from" using deadly force against Mr. Heeter. *Campbell*, 47 F.4th at 480–81 (quoting *Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987)) (cleaned up). Especially in the excessive force context, where the scope of the right is highly fact-dependent, the Supreme Court has stressed the importance of identifying controlling precedent where the factual circumstances are specific enough to "'give fair and clear warning' to officers" that

particular conduct violates the law. *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam) (quoting *White*, 580 U.S. at 79) (cleaned up).

Officer Bowers would have known Mr. Heeter had "a clearly established right not to be shot" unless he posed a threat of serious or deadly harm to the officers in his home. *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). He concedes as much. But it was also clearly established in November 2018 that, even if Mr. Heeter was armed and had disobeyed the officers' commands, these facts do not alone amount to a threat of serious or deadly harm. *See Thomas*, 854 F.3d at 366; *City of Troy*, 874 F.3d at 945 (explaining that it is "well-established" that "a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force"). In short, any officer would have known it violated the Constitution to shoot a suicidal individual that had moved slightly, even if the person held a gun in their pocket or could grab a gun within reach. Officer Bowers is therefore not entitled to qualified immunity on the excessive force claim.

## III. Adequate Medical Care

We next turn to the Heeters' claim that Officer Bowers violated Mr. Heeter's Fourteenth Amendment right to adequate medical care while in police custody. The bodycam footage shows the disturbing aftermath of the shooting—Mr. Heeter bleeding profusely, struggling to breathe, and moaning in distress. Despite his training, Officer Bowers did not provide any first aid in the minutes after the shooting and before he was dismissed from the scene. Based on the bodycam footage, the district court concluded that Officer Bowers was not entitled to immunity on this claim. We apply the two-step qualified immunity analysis and again, we affirm.

### A. Fourteenth Amendment Violation

The due process clause of the Fourteenth Amendment requires government officials to provide adequate medical care to pretrial detainees and others in their custody who are not serving a sentence. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). That includes a person who, like Mr. Heeter, has been "injured while being apprehended by the police." *Id.* To prevail on this claim, the Heeters must show that (1) Mr. Heeter "had a sufficiently serious medical need" and (2) Officer Bowers recklessly disregarded "an unjustifiably high risk of harm

that is either known or so obvious that it should be known." *Helphenstine*, 60 F.4th at 317 (cleaned up). These requirements are known as the "objective" and "subjective" components of the claim, respectively. *E.g.*, *Hicks v. Scott*, 958 F.3d 421, 438 (6th Cir. 2020). The violation arises from an officer's decisions in the face of the risk of harm, and the law does not look to whether the officer's action or inaction has a causal connection to the fate of the detainee. *Cf. Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). That is, we're not asking if Officer Bowers's failure to provide medical care was a but-for cause of Mr. Heeter's death. Instead, we're asking if, under our precedent's objective and subjective tests, Officer Bowers violated Mr. Heeter's due process rights to adequate medical care in police custody.

*Objective Component.* For the objective component, the plaintiffs must demonstrate a "serious medical need," which we identify by asking if the injury was so obvious that anyone would understand it posed a "substantial risk of serious harm" without medical intervention. *Hicks*, 958 F.3d at 438 (quoting *Blackmore*, 390 F.3d at 899). The parties agree Mr. Heeter's gunshot injuries were so obvious that anyone would recognize his need for medical care.

*Subjective Component.* For the subjective component, the plaintiffs must address the officer's mental state and responsive actions. They must show that the officer either *knew* the risk of harm and disregarded it, or that they "*recklessly disregarded* a risk so obvious that they . . . should have known of it." *Lawler ex rel. Lawler v. Hardeman Cnty.*, 93 F.4th 919, 927 (6th Cir. 2024) (citing *Helphenstine*, 60 F.4th at 317). The plaintiffs must also prove that the officer "'responded' to the risk in an unreasonable way." *Id*. at 929 (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) and citing *Beck v. Hamblen Cnty.*, 969 F.3d 592, 600 (6th Cir. 2020)).

A recent clarification on the subjective element merits some discussion. We previously applied the same standard to medical-care claims by pretrial detainees alleging due process violations under the Fourteenth Amendment and to claims by inmates alleging unconstitutional punishment under the Eighth Amendment. *See id*. at 927. That "deliberate indifference" standard required the officer not only to know the facts giving rise to the medical risk, but also to subjectively know the risk of harm, and then respond unreasonably. *Farmer*, 511 U.S. at 837, 844. Following Supreme Court precedent, we changed the mental state for the due process claims. For a Fourteenth Amendment claim, as the Heeters assert, we no longer require that the

officer *knew* the risk of harm from failure to provide medical care; an officer is still liable for *recklessly* disregarding the risk. *Lawler*, 93 F.4th at 927 (citing *Helphenstine*, 60 F.4th at 317). We clarified this new standard in *Helphenstine v. Lewis County* just a month before the district court issued its decision. 60 F.4th 305. As neither party raised the case, the district court applied the prior standard. *See* Op. & Order, R. 37, PageID 348. The change makes no difference in this case, however, because the Heeters meet the stricter, older standard. *See Bryant v. Hensley*, No. 23-5608, 2024 WL 1180440, at *4 (6th Cir. Mar. 19, 2024) (explaining defendant's conduct violated clearly established law "under either an actual-knowledge or recklessness standard"). There is no dispute that Officer Bowers subjectively knew the risk of harm—death—to Mr. Heeter from shooting him five times in the center of his body. Neither is there a dispute that Officer Bowers knew Mr. Heeter was bleeding profusely and that without immediate medical attention he had a high risk of dying.

The question we face, then, turns not on whether Officer Bowers knew or should have known the risk to Mr. Heeter, but instead on whether he "responded reasonably" to the risk. *Farmer*, 511 U.S. at 844. He didn't. As Mr. Heeter lay face down, bleeding from multiple gunshot wounds, it was unreasonable for Officer Bowers to stand idle—even for a few minutes and even while paramedics were on their way—rather than administer the first aid he was trained to provide.

Our court has repeatedly held that officers violate a pretrial detainee's right to adequate medical care when, despite knowing of an emergent risk of harm, they stand idle and fail to provide immediately necessary medical care that they have been trained to administer. In *Jones v. City of Cincinnati*, a police sergeant arrived at a scene to find a detainee lying face down and not breathing; other responding officers had subdued and asphyxiated him. 521 F.3d 555, 558 (6th Cir. 2008). The sergeant called the paramedics but didn't do anything else. *Id.* We denied the sergeant qualified immunity because he did not provide medical care or even remove the detainee's handcuffs to facilitate medical care. *Id.* at 560. Likewise, we denied qualified immunity to police officers—three of whom were trained emergency medical technicians—when they discovered that a detainee they had subdued was not breathing. *Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 600–01, 603 (6th Cir. 2005). They discussed his injuries, waited for

their supervisors, and "made no attempt to summon or provide any medical care until several minutes later." *Id.* In *Heflin v. Stewart County*, we considered the constitutional obligation of a jail deputy who encountered a detainee hanging from a makeshift noose in his cell; the deputy called for paramedics but didn't cut down the detainee or try to help him in any way, as he had been trained to do. 958 F.2d 709, 711–12, 717 (6th Cir. 1992). Thinking the detainee was dead, the deputy stood in the cell waiting for paramedics for several minutes. *Id.* We denied qualified immunity. *Id.*

To apply this law here, we consider what Officer Bowers would have known in the moments after the shooting. Mr. Heeter had just suffered multiple rifle wounds at close range, so Officer Bowers knew Mr. Heeter was in critical condition and required immediate medical care. He knew that Sergeant Redding had called the paramedics and that other officers were attending to the public safety duties of the scene. It is undisputed he had the training to provide Mr. Heeter with basic first aid while the paramedics were on the way. With that in mind, a reasonable jury could believe that Officer Bowers knew that Mr. Heeter's massive bleeding required attention right away, within minutes or seconds. The police department's Use of Force Manual even states the first priority after a suspect has been shot is to "Cause any needed medical aid to be rendered." R. 21-4, PageID 164. Accepting these facts, as we must, Officer Bowers had a Fourteenth Amendment duty to provide Mr. Heeter with basic first aid while the ambulance was en route.

Instead, Officer Bowers's first decision was to order Officer Bruce to handcuff Mr. Heeter. He told Officer Bruce to put gloves on to avoid touching Mr. Heeter's blood, suggesting he thought that Mr. Heeter was not so dangerous as to require immediate restraint. Officer Bowers heard Mr. Heeter moan as Officer Bruce started to pull his arms behind his back. Despite seeing Mr. Heeter's obvious injuries, Officer Bowers continued to command Bruce to handcuff Mr. Heeter and to loudly order, "Bill, give me your hands." Bruce Footage at 11:52–12:40; Bowers Footage at 12:45–13:00. The bodycam footage shows Bowers looked at Mr. Heeter's body. It also shows Mr. Heeter hemorrhaging blood. Officer Bowers would have seen the pool of blood too.

The footage shows what Officer Bowers did next: stood idle. Officer Bowers engaged in a nonverbal exchange with his colleagues during which he appears to have reenacted the shooting. To the extent Officer Bowers communicated with the other officers, the topic was his own well-being, not Mr. Heeter's. Sergeant Redding reassured Officer Bowers that he'd "saved everybody." Redding Footage at 10:45–10:50. "Everybody," apparently, did not include Mr. Heeter. Despite his training and police department policy, Officer Bowers did not even try to provide Mr. Heeter first aid as he lay moaning and bleeding and as his breathing became increasingly labored. The district court was therefore correct in finding Officer Bowers violated the Constitution when he "knowingly left a mortally wounded suspect lying face down on the ground while handcuffed without administering aid during the critical moments following injury." Op. & Order, R. 37, PageID 350.

In response, the defendants tell us there is a bright-line rule that after summoning the paramedics, officers have no further duty to provide medical care to pretrial detainees. Citing *Stevens-Rucker v. City of Columbus*, they contend that Officer Bowers responded reasonably because he knew the paramedics had been called, and the Constitution "does not require [an] officer to intervene personally" or "exhaust[] every medical option" so long as they call for care and do not delay it from reaching the suspect. 739 F. App'x 834, 846 (6th Cir. 2018); *see also Wilkerson*, 906 F.3d at 483 ("When police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it."). To the extent we suggested in *Stevens-Rucker* and other cases that officers do not have to "intervene personally" when they believe medical aid is en route, it was because there we accepted or presumed that the officers reasonably believed "their individual intervention would not have helped." 739 F. App'x at 846; *see also Hicks*, 958 F.3d at 439–40 (granting qualified immunity to officer who rejected another's offer to provide first aid to suspect that was shot because the officer reasonably would have thought the suspect's "lifeless" body was beyond help). That is not the case here. Given Mr. Heeter's moans and labored breathing, it was clear he was still alive, and a jury could conclude that a reasonable officer trained in basic first aid would have tried to use that training to help Mr. Heeter. Officer Bowers overreads our fact-bound cases.

As a matter of common sense and precedent, there is no bright-line rule that officers never have to provide care after calling for help. We have never held that calling for a paramedic always terminates a police officer's constitutional obligations to a pretrial detainee— irrespective of the time it will take for help to arrive, how urgently help is needed, how the officer has been trained, or even how easy it would be for the officer to help. Under the defendants' view, a trained correctional officer has no obligation to administer the Heimlich maneuver to help a choking inmate, and a prison guard has no obligation to cut down a detainee who has attempted suicide by hanging.

That's not just contrary to *Heflin*, but to myriad other precedents where we've held that calling the paramedics does not guarantee an officer qualified immunity from like Fourteenth Amendment claims. 958 F.2d at 711–12, 717; *see also Thomas*, 854 F.3d at 367 (citing *Scozzari v. Miedzianowski*, 454 F. App'x 455, 465–66 (6th Cir. 2012)). An officer's "obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance." *Scozzari*, 454 F. App'x at 466. *Jones v. City of Cincinnati* established that an officer who has called for paramedics still violates the Constitution when he decides not to provide immediately necessary medical care. 521 F.3d at 558, 560. The suspect's asphyxiation there required immediate attention just as Mr. Heeter's massive bleeding did here. *Id.* Likewise, in *Scozzari*, officers who had shot a suspect in his home called paramedics and then decided to discuss the shooting with the suspect's neighbors rather than clear the area to ensure the paramedics could reach the suspect's body. 454 F. App'x at 466. We denied qualified immunity there too. *Id.* Indeed, a key reason to provide basic medical training to officers at all is so they can treat critical injuries before paramedics arrive. *Cf. Heflin*, 958 F.2d at 714–15 (recalling how prison officials were trained statewide to cut down individuals found hanging in their cells). Even the other officers at the scene seemed to have recognized their obligation to try to save Mr. Heeter's life: Sergeant Redding and Officer Bruce at least held Mr. Heeter's head out of the puddle of blood so he could breathe and offered him words of encouragement.

Beyond arguing for a bright-line rule, Officer Bowers relies upon several other cases where the responding officers did not provide emergency medical care and we concluded that

they did not violate the Fourteenth Amendment.  But in those cases, the officers were busy protecting themselves or the public; they weren't standing idle like Officer Bowers.  The defendants cite to *Thomas v. City of Columbus*, for example, where an officer did not render aid on the spot because he feared for his own safety and "took cover" while "wait[ing] for backup to arrive."  854 F.3d at 367.  We noted there that an officer "cannot prioritize activities unrelated to securing the scene or unnecessary to their duties over trying to save the suspect's life."  *Id*. at 367 (cleaned up).  But in that case it would have been "dangerous" to render aid to the detainee, so there was no constitutional violation.  *Id*.; *see also Wilkerson*, 906 F.3d at 480, 483 (two officers on public street were not deliberately indifferent where there was no allegation officers had first aid training, they "urge[d] the ambulance to 'step it up,'" and attended and encouraged the injured as the ambulance came).  And in *Rich v. City of Mayfield Heights*, there was no occasion to ask whether the jail officer should have personally provided aid before the paramedics arrived because there the officer immediately ran to get help and then returned to the cell with the medical personnel only a minute later.  955 F.2d 1092, 1096–97 (6th Cir. 1992); *Heflin*, 958 F.2d at 718 (explaining that in *Rich*, "[t]here was no period when responsible officers were doing nothing but waiting for someone else to make the first move").

To summarize, it is undisputed that Officer Bowers focused on ordering an officer to handcuff Mr. Heeter, then stood idle as Mr. Heeter bled out, moaned, and struggled to breathe. A reasonable jury could find that Mr. Heeter's critical injury called for immediate first aid before professional paramedics arrived, and that Officer Bowers—trained in first aid and unoccupied by police duties—could and should have rendered that care.  Therefore, a reasonable jury could find Officer Bowers violated Mr. Heeter's Fourteenth Amendment right to adequate medical care.

**B.  Clearly Established Law on Adequate Medical Care in Police Custody**

We next ask if it was "clearly established" in November 2018 that these actions would violate the Constitution.  *Beck*, 969 F.3d at 599.  For us to consider a right clearly established, a broad, generalized construction will not do.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The contours of the right must be defined so that it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  While it is not necessary that we have a case in the same factual scenario or

that "the very action in question has previously been held unlawful," it must be apparent to an official "in the light of" existing law that such actions are unlawful. *Id.* at 640. We ask whether our existing cases give "'fair and clear warning to officers' about what the law requires." *Beck*, 969 F.3d at 599 (quoting *Vanderheof v. Dixon*, 938 F.3d 271, 279 (6th Cir. 2019)) (citation omitted in original).

The Supreme Court established in 1983 that an officer has an obligation under the Due Process Clause to provide adequate medical care to suspects shot during apprehension. *City of Revere*, 463 U.S. at 244. As discussed above, the standard applicable in November 2018 required a plaintiff to show an officer knowingly and deliberately disregarded a detainee's risk of harm in order to prevail on an adequate medical care claim. *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016). Since at least 2005, we applied the rule to officers who engaged in banal chatter as a suspect they had asphyxiated sat without breathing. *Owensby*, 414 F.3d at 603. Since at least 2008, it was clear that a police officer who calls paramedics for a critically injured suspect violates the Constitution when he can safely attend to the suspect's obvious injuries, but instead does nothing. *Jones*, 521 F.3d at 558, 560; *see also Heflin*, 958 F.2d at 714–15. Officer Bowers's conduct fits squarely within this precedent; from these rules it "follow[s] immediately" that he violated the Constitution. *Beck*, 969 F.3d at 599 (quotation omitted). He is therefore not entitled to qualified immunity on the adequate medical care claim.

The defendants argue that existing precedent defined the rule at too high a level of generality for it to have clearly established that Officer Bowers needed to provide basic first aid after shooting Mr. Heeter. *See Ashcroft*, 563 U.S. at 742. They correctly note that the cases are each fact dependent. But "there is no requirement of absolute factual identity before the law may be found to be 'clearly established.'" *Heflin*, 958 F.2d at 718 (quotation omitted). And the cases we have described would put officers on notice that their actions (or inactions) were unlawful.

Officer Bowers fails to meaningfully distinguish them. In parsing cases, for example, Officer Bowers falters on *Jones v. City of Cincinnati*. Tellingly, he attempts to distinguish it based on procedural posture, rather than the "fact pattern." *Beck*, 969 F.3d at 599. But that isn't relevant given that on a motion to dismiss we construe the facts in the light most favorable to the plaintiff, as we do at summary judgment, and ask if there was a clearly established constitutional

violation. While he addresses some of the officers' conduct in that case, he skips over our analysis of the sergeant who arrived at the scene and called the paramedics after the other officers had beaten and maced the suspect. *See Jones*, 521 F.3d at 558, 560. We denied him qualified immunity because, while he did call for help, he didn't provide the suspect with the medical care even though the suspect was obviously struggling to breathe. *Id.* The defendants do not identify a "constitutional distinction" between the conduct of that sergeant and Officer Bowers. *Hope v. Peltzer*, 536 U.S. 730, 742 (2002). Like the sergeant in *Jones*, Officer Bowers had an obligation to provide Mr. Heeter with immediately necessary medical care; his decision to instead stand idle violated the Constitution.

Nor is it persuasive for Officer Bowers to argue that he was relying on broad statements in several of our cases stating that, when police injure a suspect, "they *generally* satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it." *Wilkerson*, 906 F.3d at 484 (emphasis added); *see also Stevens-Rucker*, 739 F. App'x at 846 (no "absolute requirement" that an officer personally provide medical aid or "exhaust[] every medical option."). In relying on these singular sentences, Officer Bowers is trying to have it both ways—he wants to use helpful language in our precedents, while discarding critical distinctions. True, our qualified immunity analysis rests in part on a fiction that police officers read our cases. That's why only a factually similar case can put officers on "fair notice" that their actions would violate the law. Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chi. L. Rev. 605, 619 (2021) (emphasis omitted) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also Sosa v. Martin Cnty.*, 57 F.4th 1297, 1304 (11th Cir. 2023) (Jordan, J., concurring) (analyzing claim of qualified immunity "under the legal fiction" of "a reasonable police officer who read [the relevant] cases"). Supreme Court precedent compels us to sustain that fiction. But that instruction also means we must reject officers' attempts to use a case's generalized statements of law, devoid of factual context, to shield themselves from their clearly established constitutional obligations. That a case announces a general rule of thumb tells us little about what is lawful under these facts and circumstances.

For "fair notice," we look to analogous cases (and sometimes, common sense). *Brosseau*, 543 U.S. at 599 (citation omitted). Based on the law in November 2018, the "unlawfulness of doing nothing to attempt to save" Mr. Heeter's "life would have been apparent to a reasonable officer" in Officer Bowers's position. *Heflin*, 958 F.2d at 717. As the district court concluded, Officer Bowers is therefore not entitled to qualified immunity on this claim.

## STATE-LAW CLAIMS

Because the questions regarding Ohio law immunities largely track federal immunities, we need not discuss them in detail. The district court denied the defendants summary judgment on their claims that they were immune from suit under Ohio Revised Code § 2744.03, which entitles Ohio municipal employees to immunity. We have appellate jurisdiction to review these denials of state-law immunity to the extent they turn on questions of law, and our review is de novo. *Hopper v. Plummer*, 887 F.3d 744, 759–60 (6th Cir. 2018); *Sabo v. City of Mentor*, 657 F.3d 332, 336–37 (6th Cir. 2011).

## I. Municipal Immunity Under Ohio Rev Code § 2744.02

We start with municipal immunity under Ohio Revised Code § 2744.02. This statute provides that an Ohio "political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision . . . ." *Id.* § 2744.02(A)(1). Recall that the Heeters brought state law tort claims against Officer Bowers in his individual and official capacities and against the Columbus Police Department. The Department is an improper defendant because it is part of the larger entity of the City of Columbus, but we "liberally construe the complaint as having been brought against" the City itself. *Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Likewise, an action against an officer in his official capacity is "another way of pleading an action against an entity of which an officer is an agent," in this case the City. *State ex rel. Est. of Miles v. Vill. of Piketon*, 903 N.E.2d 311, 315 (Ohio 2009) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)). The Heeters have thus asserted state-law claims against the City.

As an Ohio political subdivision, the City of Columbus is entitled to § 2744.02's "broad grant of immunity" and therefore not liable for any of the Heeters' state-law claims. *Chester v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). The Heeters do not challenge this conclusion. Nevertheless, the district court denied the motion for summary judgment on "the state law claims against both Defendants." Op. & Order, R. 37, PageID 359. That was an error, and we reverse and remand to the district court with instructions to grant summary judgment for Officer Bowers in his official capacity and the Columbus Police Department on the state-law claims.

## II. Municipal Employee Liability Under Ohio Rev. Code § 2744.03

Officer Bowers also claims that he is immune under Ohio Revised Code § 2744.03 from the Heeters' state-law claims against him in his individual capacity. Section 2744.03 immunizes municipal employees from suit in their individual capacities unless they "acted with a malicious purpose, in bad faith, or in a wanton or reckless manner." *Sabo*, 657 F.3d at 337 (citing Ohio Rev. Code § 2744.03(A)(6)(b)). This standard overlaps with our qualified immunity analysis because officers act in a "wanton or reckless" manner when they violate an individual's clearly established constitutional rights. *Hopper*, 887 F.3d at 759–60 (citation omitted); *see also id.* (quoting *Chappell*, 585 F.3d at 907 n.1) ("[W]e may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'"). Because Officer Bowers is not entitled to qualified immunity from the Heeters' constitutional claims, he is similarly not entitled to summary judgment on his state-law municipal employee defense. *See id.* at 760 ("Defendants' statutory immunity defense stands or falls with their federal qualified immunity defense."). We therefore affirm the district court in denying Officer Bowers immunity under § 2744.03 from suit in his individual capacity.

### CONCLUSION

For the foregoing reasons: (1) we deny Heeters' motion to dismiss the appeal and for sanctions, (2) we affirm the judgment of the district court in all but one respect—(3) we reverse the district court's denial of municipal immunity under Ohio Rev. Code § 2744.02 and remand with the instruction to grant the City (that is, Officer Bowers in his official capacity and the Columbus Police Department) summary judgment.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. The majority finds that we have jurisdiction to consider the entirety of Defendants' appeal, and affirms the district court's decision in all but one narrow respect. I agree with the majority only to the extent that it reverses the district court's denial of state law immunity to the Columbus Police Department and Officer Bowers in his official capacity. On all other issues, however, Defendants continue to litigate factual disputes, thus depriving us of jurisdiction over the remainder of this appeal. The majority casts aside these factual disputes by either crediting Defendants' inauthentic concession of the facts in the light most favorable to Plaintiffs, or by simply ignoring Defendants' factual disputes over crucial matters. This approach contradicts our well-established rule that we have jurisdiction to hear interlocutory qualified immunity appeals only when the defendant concedes the plaintiff's view of the facts. Because I would dismiss this appeal for lack of jurisdiction as it relates to the claims brought against Officer Bowers, I respectfully dissent.

This case arises out of the shooting of Bill Heeter while officers were responding to a mental health emergency. The majority largely summarizes the facts of this encounter accurately. As it acknowledges, the body camera footage of the incident does not fully capture Mr. Heeter's movements just before Officer Bowers shot him, nor does it capture where Mr. Heeter's gun was located just before he was shot. These crucial moments are the basis for the bulk of the factual disputes on appeal; however, the majority casts aside Defendants' relentless refusal to accept Plaintiffs' version of these disputed facts. But it is this continuing dispute concerning whether Plaintiffs can prove their case at trial that deprives us of jurisdiction.

Exercising jurisdiction over the claims against Officer Bowers in this appeal contravenes the limits on our jurisdiction set by Congress and the Supreme Court. Generally, our jurisdiction is limited by statute to only permit review of "final decisions" from a district court. 28 U.S.C. § 1291. Although some interlocutory appeals are permitted, the statute governing our jurisdiction "recognizes that rules that permit too many interlocutory appeals can cause harm." *Johnson v. Jones*, 515 U.S. 304, 309 (1995). Specifically, too many interlocutory appeals can

cause delays in litigation, making it more difficult for trial courts to "do their basic job." *Id.* Appeals of a denial of qualified immunity are an exception to this rule because qualified immunity protects individuals from litigation itself, not just ultimate liability. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 525 (6th Cir. 2002). However, because interlocutory appeals have the potential to infringe on the district court's role in supervising trial proceedings, the Supreme Court has placed clear limits on our review of an interlocutory appeal of a denial of qualified immunity. *See Johnson*, 515 U.S. at 315–317.

When reviewing an interlocutory appeal contesting the denial of qualified immunity, "we have jurisdiction only to the extent that the defendant limits his argument to questions of law premised on facts taken in the light most favorable to the plaintiff." *Gillispie v. Miami Township*, 18 F.4th 909, 915 (6th Cir. 2021) (cleaned up). The Supreme Court has told us that "[w]e lack jurisdiction to consider 'a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Moldowan v. City of Warren*, 578 F.3d 351, 369–70 (6th Cir. 2009) (quoting *Johnson*, 515 U.S. at 313).

We have recognized two exceptions to this rule. First, a defendant who challenges a district court's denial of qualified immunity on the basis that a genuine dispute of material fact exists for trial "may invoke our jurisdiction by conceding the plaintiff's version of the facts." *Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024). Importantly, however, this concession must be genuine. *Id.* ("Because a concession in name only is no concession at all, we hold that such concessions are insufficient to invoke our jurisdiction."). If a defendant only purports to concede the plaintiff's version of the facts, this Court lacks jurisdiction. *Id.* Second, a defendant may also invoke this Court's jurisdiction by showing that the district court's factual determination is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Gillispie*, 18 F.4th at 916. For the reasons stated below, Defendants have not established our jurisdiction to hear this appeal under either exception to the rule that we may not hear fact-based interlocutory appeals of a denial of qualified immunity.

**I. Excessive Force**

Defendants claim, and the majority agrees, that this Court has jurisdiction to consider Defendants' arguments on the Fourth Amendment excessive force claim. Although Defendants' own theories of jurisdiction have evolved in their briefing, ultimately they attempt to claim jurisdiction under both exceptions to the general rule that this Court lacks jurisdiction over fact-based appeals of a denial of qualified immunity. That is, Defendants claim to have conceded the facts in the light most favorable to Plaintiffs, and they claim that the video of the shooting blatantly contradicts the district court's factual findings. As an initial matter, I agree with the majority's rejection of the latter theory, as the record evidence does not blatantly contradict the factual findings of the district court. Defendants attempt to argue that because there are gaps in the video of the shooting, this Court must credit the affidavits of officers at the scene as setting forth undisputed facts. This directly contradicts this Circuit's precedent, which requires us to "view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff." *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

The majority, however, incorrectly concludes that we otherwise have jurisdiction to review Defendants' arguments relating to the excessive force claim. It reaches this conclusion by claiming that Officer Bowers has conceded where Mr. Heeter's gun was in the moments before the shooting for purposes of appeal, calling this "the singular contested fact we cannot discern from the video." Maj. Op. at 12. However, because Defendants have not genuinely conceded the location of the gun in the light most favorable to Plaintiffs, and because this is not the "singular" fact that Defendants contest as it relates to the excessive force claim, I disagree that we have jurisdiction to review this claim.

Throughout their briefing, Defendants impermissibly target their arguments at the sufficiency of Plaintiffs' evidence. Specifically, they repeatedly contest where Mr. Heeter's gun was located when Officer Bowers shot Mr. Heeter—namely, whether Mr. Heeter was pulling the gun from his pocket just before he was shot. They point to multiple facts in the record that they claim support finding that the gun was in Mr. Heeter's pocket. For example, they note that the gun was found next to Mr. Heeter's right leg after he was shot, and that another officer stated that the gun looked like it had been hit by a bullet, which Defendants argue supports their theory

that Mr. Heeter had the gun in his possession when he was shot. Moreover, they point to Officer Bowers' affidavit, which stated that he saw Mr. Heeter's hand form a "grip" as if he was holding a pistol just before Officer Bowers shot Mr. Heeter. Bowers Aff., R. 21-1, Page ID #146. Defendants suggest that this Court should credit Officer Bowers' affidavit as uncontradicted evidence because the video does not clearly show whether Mr. Heeter had a gun in his hand when he was shot.

All of these arguments amount to factual disputes that are unreviewable on this interlocutory appeal. Defendants even admit this shortcoming in their briefing. For example, in their reply brief, they describe the "core of Bowers' arguments on appeal" as follows:

> Bowers contends that Plaintiffs-Appellees have not met their burden of demonstrating that Bowers is not entitled to qualified immunity on the excessive force claim because they fail to identify specific facts in the record showing a genuine issue of material fact for trial.

Reply Br., ECF No. 31, 16–17 (emphasis omitted); *see also* Def.'s Opp. Br., ECF No. 28, 10 ("Defendant Bowers asserts that the district court erred in finding that a genuine issue of material fact exists for trial."). Notwithstanding Defendants' factual disputes, the majority claims that Defendants have properly conceded the location of the gun for purposes of appeal. For this conclusion, the majority relies on a statement in Defendants' brief, as well as a statement from Defendants' counsel at oral argument. Neither statement constituted a proper concession.

First, although Defendants' briefs purport to concede Plaintiffs' version of the facts at points, the briefs then immediately continue to recite a version of the facts that Plaintiffs do not accept. For example, in their opening brief, after "assuming *arguendo* that Mr. Heeter's gun was on the table instead of in his pocket," Defendants argue that, after Mr. Heeter was shot, the gun "ended up on the ground and appeared to be hit by a bullet." Def.'s Br., ECF No. 19, 45–46. Thus, immediately after claiming to concede the fact that Mr. Heeter's gun was on the table just before he was shot, Defendants proceed to question that very fact. Defendants' brief in response to Plaintiffs' motion to dismiss the appeal for lack of jurisdiction similarly lacks a genuine concession, even while claiming to present a purely legal question for us to review. *See* Def.'s Opp. Br., ECF No. 28, 16–18 ("Plaintiffs-Appellees fail to present any other evidence to

contradict Officer Bowers' account of Mr. Heeter pulling what Officer Bowers reasonably believed to be a gun from his pocket.").

Second, counsel's purported concession at oral argument was similarly ineffective. At oral argument, the panel pressed Defendants' counsel as to whether Defendants conceded the location of the gun. In response to this questioning, Defendants' counsel continued to dispute the facts by telling the panel that "actually, what it really does boil down to is you can't see what Mr. Heeter is doing with his right hand on the" video. Oral Arg. Rec. at 10:48–10:55. Only after more pressing from the panel did counsel claim that Bowers was entitled to qualified immunity even if the gun was on the table when he shot Mr. Heeter. But crediting this brief statement made at oral argument as genuine would force us to disregard counsel's own clear statement that this appeal "really . . . boil[s] down to" a factual dispute as to where the video depicts the gun before Mr. Heeter was shot. Oral Arg. Rec. at 10:48–10:55. Furthermore, counsel's purported concession—which was immediately preceded by an express factual disagreement—resembles the same ineffective concessions made in Defendants' briefs ahead of argument. That counsel may have claimed to concede Plaintiffs' version of the facts for purposes of this appeal in response to direct and pointed questions does not override the repeated failure to do so in Defendants' briefs or during the majority of oral argument.

Moreover, both of these purported concessions about where the gun was located just before the shooting do not concede every factual dispute on appeal. Specifically, Defendants continue to dispute how Mr. Heeter behaved just before he was shot, and particularly dispute what type of movement he made. This factual dispute is evident from the record. As the majority acknowledges, the body camera video is "partially obscured" and does not clearly show what Mr. Heeter did in the moments before he was shot. Maj. Op. at 5. And in their affidavits, the officers offered different accounts of Mr. Heeter's movements just before he was shot. One officer stated that Mr. Heeter "lunged," Bruce Aff., R. 21-6, Page ID #175, whereas another stated that Mr. Heeter "made a movement, like he was going to lean forward," Gibson Aff., R. 21-8, Page ID #178.

On appeal, Defendants have not conceded this factual dispute. Instead, they argue that "the district court erroneously found that 'the video evidence suggests that Mr. Heeter only

leaned slightly forward with nothing in his hand'" because "Mr. Heeter's right side, including his right hand, are not visible in the body worn camera footage, and his movements are not fully captured." Def.'s Br., ECF No. 19, 40 (emphasis omitted). This, again, directly challenges whether the district court properly concluded that a genuine dispute of fact existed for trial. As a result, this Court does not have jurisdiction to resolve this appeal. *See Moldowan*, 578 F.3d at 370.

The majority's decision to find jurisdiction over Defendants' excessive force arguments is all the more confusing when considering our precedent. This case appears to directly resemble *Berryman v. Rieger*, in which we dismissed an appeal for lack of jurisdiction because the defendants "contradicted [the plaintiff's] version of the facts at every turn." 150 F.3d 561, 564 (6th Cir. 1998). In *Berryman*, even after the defendants purported to concede the plaintiff's version of the facts for purposes of appeal, we concluded that, after argument, "it is now obvious that their appeal boils down to credibility determinations we cannot make." *Id.* This case similarly presents contested factual disputes as Defendants have admitted time and again in their briefing and at oral argument. In Defendants' counsel's own words, their argument on appeal "really . . . boil[s] down to" where the gun was located just before Officer Bowers shot Mr. Heeter. Oral Arg. Rec. at 10:48–10:55. We should take counsel at her word. When a defendant does not truly concede the version of the facts in the light most favorable to the plaintiff and continues to litigate factual disputes, we have consistently dismissed the appeal for lack of jurisdiction. *See Anderson-Santos*, 94 F.4th at 555; *Booher v. N. Kent. Univ. Bd. of Regents*, 163 F.3d 395, 396–37 (6th Cir. 1998); *Berryman*, 150 F.3d at 564–65. I respectfully dissent from the majority's refusal to do so in this case.

## II. Deliberate Indifference to Medical Treatment

The majority further errs by concluding that we have jurisdiction to review the Fourteenth Amendment deliberate indifference claim raised on appeal. To be sure, Defendants have attempted to present a pure legal question for this Court's review as to this claim; however, despite their best efforts, they continue to inject factual disputes into what otherwise could have been a purely legal argument. Because Defendants' arguments have "drift[ed] from the purely

legal into the factual realm" on this claim as well, we lack jurisdiction to consider it. *Berryman*, 150 F.3d at 564.

Defendants primarily argue that Officer Bowers only needed to promptly call for paramedics to avoid being liable for deliberate indifference to medical treatment. They rely on a general statement from a previous, factually dissimilar opinion from this Court to support this claim. *See Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018) ("When police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it."). Although I would not reach the merits of this argument, I note that, under these circumstances, it is inconsistent with our prior precedent to claim that Officer Bowers constitutionally did not need to provide any basic aid to Mr. Heeter while he lay bleeding on the floor because another officer called the paramedics. *See, e.g.*, *Jones v. City of Cincinnati*, 521 F.3d 555, 558, 560 (6th Cir. 2008); *Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 600–601, 603 (6th Cir. 2005).

Despite making this legal argument their primary focus, Defendants still litigate the factual dispute of whether rendering basic first aid would have been futile, stating: "Plaintiffs-Appellees have not presented any evidence supporting their contention that basic first aid would have helped Mr. Heeter." Def.'s Br., ECF No. 19, 52. This Court has previously found that when rendering aid would have been futile to assist an injured person, an officer's failure to promptly provide medical care may be excused. *See Hicks v. Scott*, 958 F.3d 421, 439–40 (6th Cir. 2020); *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 846 (6th Cir. 2018). The majority disregards this dispute, and, instead, chooses to construe this fact in the light most favorable to Plaintiffs—that is, that rendering aid would not have been futile. But this approach is generally appropriate only when the factual disputes are not "crucial" to a defendant's arguments on appeal. *Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020) ("If, however, disputed factual issues are crucial to a defendant's interlocutory qualified immunity appeal, we may not simply ignore such disputes; we remain obliged to dismiss the appeal for lack of jurisdiction." (cleaned up)).

As the majority's analysis confirms, the resolution of this dispute is crucial to holding that Officer Bowers is not entitled to qualified immunity at this stage. The majority

acknowledges that if Officer Bowers had reasonably believed that personal intervention would not have helped Mr. Heeter, he would not have been deliberately indifferent in failing to render any basic first aid under our precedent. Because this particular fact is crucial to the majority's analysis, Defendants' continued dispute of it cannot be ignored. *Id.* Instead, because Defendants continue to litigate factual disputes in their arguments addressing whether Officer Bowers was deliberately indifferent to Mr. Heeter's serious medical needs, "we remain obliged to dismiss the appeal for lack of jurisdiction."[1] *Id.* (cleaned up).

## III. CONCLUSION

Defendants have presented us with a classic example of the types of evidence-sufficiency arguments that this Court has consistently declined to review on an interlocutory appeal. The majority ignores Defendants' own acknowledgements in their briefing and at oral argument that this appeal "boil[s] down" to an argument that Plaintiffs cannot prove their case at trial. Oral Arg. Rec. at 10:48–10:55. Because we do not have jurisdiction to review the factual disputes Defendants present, I respectfully dissent from the majority's choice to find jurisdiction in this case. We should dismiss this qualified immunity appeal for lack of jurisdiction.

---

[1]For the same reasons stated above, we also lack jurisdiction over the state law claims made against Officer Bowers in his individual capacity. The factual basis for these claims is the same as that for Plaintiffs' constitutional claims, and they should therefore also be dismissed for lack of jurisdiction. *Moldowan*, 578 F.3d at 398.