NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0270n.06

No. 25-5769

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 22, 2026
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| JOHN NORMAN, | ) |
| Plaintiff-Appellant, | ) ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) |
| JOSEPH HORTON, et al., | ) |
| Defendants-Appellees. | ) OPINION |

Before: CLAY, McKEAGUE, and NALBANDIAN, Circuit Judges.

CLAY, J., delivered the opinion of the court in which McKEAGUE, J., concurred, and NALBANDIAN, J., concurred in part and in the result. NALBANDIAN, J. (pp. 17–22), delivered a separate concurring opinion.

**CLAY, Circuit Judge.** Police shot and killed Desman LaDuke after they were called to his house to perform a welfare check. John Norman, acting as administrator of LaDuke's estate, sued officers under 42 U.S.C. § 1983 and Kentucky state law. The district court granted summary judgment to Defendants. For the reasons explained below, we **AFFIRM** the district court.

## I. FACTUAL BACKGROUND

On the morning of October 22, 2022, Desman LaDuke told his girlfriend, Kassidy Marksberry, that he was going to kill himself. Marksberry called LaDuke's aunt, Melissa Marks, for help and indicated to Marks that she had either confiscated a gun from LaDuke or was in the process of trying to do so. According to Marks, LaDuke had a history of mental health problems, but this episode struck her as particularly grave because LaDuke kept saying that "he was going

to die." Marks Dep., R. 49, PageID #457. She called the police and reported that LaDuke was threatening to kill himself and that he had a gun.

After Marks called 911, two Nicholasville Police Department (NPD) officers, Todd Sponcil and Jeremy Balltrip, were dispatched to LaDuke's residence with instructions that they were responding to a suicide threat. LaDuke refused to provide identification to them or to exit the house, and the officers informed him that they would not be leaving until he came out and spoke to them. According to Officer Sponcil, officers were required to stay at the scene until they got "face to face" "[c]onfirmation and reassurance" from LaDuke "that everything[] [was] going to be ok." Sponcil Dep. Tr., R. 50, PageID #529. Not long after police arrived, Marksberry exited the house and told officers that LaDuke "had a gun and was suicidal." *Id.* at PageID #604.

Other police arrived at the scene, including Captain Matt Marshall who, as the highest-ranking NPD officer there, assumed the role of incident commander. Captain Marshall also assumed lead negotiating responsibilities and, in an effort to diffuse the situation, spent much of the encounter coaching Marks on how to best communicate with LaDuke in a series of FaceTime calls she had with him. Captain Marshall testified that, at one point during the FaceTime calls, LaDuke said that "there's a 95 percent chance that I die or . . . the police die." Marshall Dep. Tr., R. 53, PageID #941.

Captain Marshall and other NPD leadership also activated NPD's Special Response Team (SRT), commanded by Lieutenant Jason Fraddosio. Seven SRT Officers, including Officer Joseph Horton, arrived at the scene around 11:30 am and surrounded LaDuke's residence with their guns raised. According to Marks, LaDuke was alarmed by SRT's presence. She testified that LaDuke told her that that he did not want to leave the house because "they were going to kill him," which was why "they [had] all these guns aimed at [him]." Marks Dep., R. 49, PageID #465.

According to Captain Marshall, at around 12:45 pm, LaDuke appeared to experience an "emotional spike" based on his behavior on the FaceTime calls with his aunt. Marshall Dep., R.53, PageID #946. LaDuke stopped engaging with his aunt over the phone, and became "more aggressive and angry," so Captain Marshall left the vehicle he had been sitting in and walked to the rear of the house where Officers Horton, Fraddosio, and others were positioned. Captain Marshall told Officer Fraddosio that he had noticed a shift in LaDuke's mood, but that he planned to continue outreach, and he thought they could get LaDuke "back to the emotional plane where [they] want[ed] him." *Id.* at PageID #949.

Sometime after this, LaDuke appeared at the rear window of his residence holding a firearm. Based on Officer Balltrip's bodycam audio, the officers at the scene—and in particular Officer Horton—began repeatedly yelling at LaDuke to drop the gun. The accounts of precisely what happened next vary, however, all of the witnesses agree that LaDuke began yelling profanities or making profane gestures toward them and waving around the gun in his hand.

According to several officers including Horton and Fraddosio, LaDuke was holding not one but two guns while standing at the window. According to Officer Fraddosio, LaDuke began "raising the guns up, pointing them" at Fraddosio and in the direction of where Officer Horton was standing, and "then raising them to his head." Fraddosio Dep., R.54, PageID #1053. Officer Fraddosio testified that LaDuke repeated this motion two or three times. In response to one of the times LaDuke made the motion, Officer Fraddosio stated, "if he does that again, we're going to have to shoot him." *Id.* at PageID #1054. Officer Horton's account basically accords with Fraddosio's. He testified that, in the seconds leading up to the shooting, LaDuke clicked both guns against the window, raised both to his head, then got "a serious look on his face, and . . . started lowering—leveling the guns . . . down towards the window, towards the officers." Horton Dep.,

R.55, PageID #1245. Officer Horton stated that he perceived LaDuke to be pointing the guns first at himself (Officer Horton) and then at the officers behind him. It was at this point that Officer Horton shot LaDuke.

Captain Marshall, who was standing directly next to and behind Officer Horton during and in the lead up to the shooting, had a slightly different account. According to him, LaDuke was only holding one gun, and, although LaDuke was waving the gun around, he never saw LaDuke point the gun at officers.[1] But around three seconds before Horton fired and in an attempt to reach LaDuke on the phone, Marshall moved behind cover and no longer could see LaDuke. He also stated that he was surprised when he heard the shot Horton fired at LaDuke.

Ultimately, LaDuke was shot by Officer Horton at around 1:19pm and later died from the wound.

## II. PROCEDURAL BACKGROUND

John Norman, the court-appointed administrator of Desman's estate, filed suit against Joseph Horton and Jason Fraddosio. He alleged that both Defendants violated 42 U.S.C. § 1983 by using excessive force against LaDuke in violation of the Fourth Amendment (Count I). He also alleged that Defendant Fraddosio, in his official capacity, violated § 1983 by "develop[ing] and endors[ing] a policy and practice" of deploying untrained SRT officers, "treating mental health crisis calls and/or barricaded subjects as if it were a hostage rescue," and "responding and acting without an Operations Plan in its encounters with mentally distressed subjects" (Count V). Second Am. Compl. (SAC), R.31, PageID #148-49. Plaintiff also brought various Kentucky state tort law

---

[1] More specifically, Captain Marshall stated that "in waving the gun, you can stop waving the gun at any point and fire a shot and injure someone. Was it a stationary pointing of the weapon? No." Marshall Dep., R.53, PageID #955.

claims against both Defendants for assault and battery (Count II), negligence and gross negligence (Count III), and wrongful death (Count IV).

Defendants moved for summary judgment and Plaintiff responded. With respect to the state law claims, Plaintiff argued that Defendants were negligent because they failed to comply with ministerial duties conferred on them by NPD's Persons of Diminished Capacity policy. In reply, Defendants asked the district court to decline to consider this argument, which they said constituted a new theory of liability that "reverse[d] course from Plaintiff's original negligence theory—that Horton and Fraddosio negligently applied deadly force." Reply, R. 74, PageID #1725. The court agreed and declined to consider the new argument.

The district court granted summary judgment to Defendants and dismissed Plaintiff's action. After the court entered its judgment, Plaintiff moved to alter or amend the court's summary judgment opinion and order on the state law claims. He argued that the court had erred by declining to consider the new negligence theory and, therefore, should amend its judgment so that it could address the theory. In his view, Defendant was on notice of the liability theory relating to the PDC policy because multiple witnesses, including Horton, had discussed the policy in their depositions, experts for both sides had discussed it in their reports, and Plaintiff had referenced the report in his SAC. The court denied Plaintiff's motion to alter or amend, determining that Plaintiff had failed to properly plead the negligent-performance-of-policy theory. It also denied Plaintiff's request to amend the complaint to explicitly allege the new theory.

Plaintiff appealed.

### III. DISCUSSION

### A. Standard of Review

We review *de novo* the district court's grant of summary judgment. *Miller v. Adm. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006). A party is entitled to summary judgment if, based on the record as a whole, there are no "genuine dispute[s] as to any material fact" that could lead a factfinder to find for the moving party's opponent. Fed. R. Civ. P. 56(a); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position" is "insufficient" to defeat the moving party's motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Ultimately, we must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In doing so, we construe the evidence and all reasonable inferences in favor of the nonmoving party. *Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 332 (6th Cir. 2008).

### B. Analysis

### 1. Excessive Force Claim

Plaintiff claims that Officers Horton and Fraddosio subjected LaDuke to excessive force and deprived him of his Fourth Amendment "protection against use of excessive, or unreasonable, force." *King v. City of Rockford, Michigan*, 97 F.4th 379, 393 (6th Cir. 2024). Plaintiff asserts two theories of excessive force. First, he argues that Defendants engaged in an excessive show of force when they, along with the other SRT officers, surrounded LaDuke's house and held him at gunpoint. Second, he argues Defendants engaged in the use of excessive force by shooting and killing LaDuke.

The district court granted summary judgment to Defendants on the excessive force claim after finding that they were shielded by qualified immunity under both the show and use of force theories. Qualified immunity protects government officials from civil liability under § 1983 unless the plaintiff can show that (1) the official violated a federal statutory or constitutional right and that (2) the unlawfulness of their conduct was clearly established at the time of the official's act. *Reich v. City of Elizabethtown*, 945 F.3d 968, 977 (6th Cir. 2019). Because there is no rule clearly establishing Defendants' actions as unconstitutional, we agree with the district court's decision to grant summary judgment to Defendants.

### a. Excessive Use of Force Theory

We first address Plaintiff's excessive use of deadly force claim. He argues that Officer Horton used excessive force by firing the shot that killed LaDuke and that Officer Fraddosio used excessive deadly force by ordering Horton to shoot. *See Floyd v. City of Detroit*, 518 F.3d 398, 406-07 (6th Cir. 2008) (an officer may be liable for an excessive force claim if he "unambiguously signal[s] that such force was called for.").

"The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers." *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). An officer's use of *deadly* force is unreasonable unless "the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). We assess the "reasonableness of a use of force . . . from the perspective of a reasonable officer on the scene without the benefit of '20/20 vision of hindsight.'" *King*, 97 F.4th at 393 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

We need not assess whether Defendants' conduct was unreasonable under the Fourth Amendment because, even construing the facts in the light most favorable to Plaintiff, there is no

rule clearly establishing their actions as unconstitutional. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right" at the time the allegedly violative act occurred. *Binay v. Bettendorf*, 601 F.3d 640, 646-47 (6th Cir. 2010) (citation omitted). Although it is "axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[] a threat of serious physical harm,'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citation omitted), that proposition is too general to serve as the "clearly established" rule for purposes of qualified immunity, *see Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). The rule must be more specific: in *Brosseau v. Haugen*, for example, the Court described an appropriately-particularized rule for the specifics of that case as one that established the constitutionality of "shoot[ing] a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." 543 U.S. 194, 200 (2004) (per curiam).

We do have clearly established precedent in this Circuit stating that an officer does not have probable cause to shoot a mentally ill individual who is unarmed, even if he makes certain threatening or aggressive gestures toward officers. *Palma v. Johns*, 27 F.4th 419, 443 (6th Cir. 2022). But the facts of this case are different. Differences in the officer witnesses' testimony notwithstanding, there are undisputed facts demonstrating that LaDuke was armed with at least one firearm, that he was refusing to comply with police requests to drop the firearm, and that in the moments before he was shot, LaDuke was—at the very least—waving the gun around. He also uncontestably engaged in other aggressive and taunting behavior while armed, including yelling profanities at the police.

To meet the clearly established standard here, Plaintiff would need to point to a rule stating something like: an officer does not have probable cause to shoot a mentally ill individual, wielding a gun and taunting officers with it, and disobeying officers' commands to drop the weapon. But Plaintiff is unable to point to a case establishing a rule like this. The best case for Plaintiff, *Heeter v. Bowers*, 99 F.4th 900 (6th Cir. 2024), falls short. There, officers were called to the home of Bill Heeter, who had access to a gun and was threatening to shoot himself. *Id.* at 905. Officers responded and entered Heeter's home. *Id.* Once inside, they observed Heeter standing in his kitchen with his hands in his pockets, and they commanded him to raise his hands and drop his gun, which was either in his pocket or within arm's reach. *Id.* at 905-06. Heeter took his hands out of his pockets, clearly not holding a gun—he then made a slight movement with his body and an officer shot him five times in the chest. *Id.* at 906. We held that suicidal individuals, like Heeter, had a clearly established right not to be shot when they "had moved slightly," even if they "held a gun in their pocket or could grab a gun within reach." *Id.* at 915. But *Heeter*'s rule does not fit the instant case: at the time he was shot, LaDuke was not standing with his hands raised in the air, clearly demonstrating that he did not hold a gun. Instead, he was brandishing and waving around a pistol. *Heeter* thus does not supply a clearly established rule stating that Defendants' use of force was unconstitutional, and we are aware of no other cases that come as close as *Heeter*.

Accordingly, we affirm the district court's determination that Defendants were entitled to qualified immunity under the use of force theory.

### b. Excessive Show of Force Theory

Plaintiff also argues that Defendants engaged in an unreasonable show of force when they, along with the rest of the SRT team, surrounded LaDuke's house with guns drawn. The Fourth Amendment right to be free from the use of disproportionate force prohibits, in some

circumstances, the mere show of excessive force. *See Vanderhoef v. Dixon*, 938 F.3d 271, 280 (6th Cir. 2019). However, as with the use of force theory, there is no clearly established rule prohibiting Defendants' conduct in this case.

Our precedent states that officers may point their guns at a subject who presents some degree of risk to the officers. In *Collins v. Nagle*, several individuals sued Kentucky law enforcement investigators who arrested them on suspicion of conducting illegal mining operations. 892 F.2d 489, 492-93 (6th Cir. 1989). One of the plaintiffs claimed that an investigator used excessive force during the arrest because he "app[r]oached the scene" and "pointed a gun at" him. *Id.* at 497. Although the plaintiffs did not fully cooperate with the investigators during the encounter and arrest, there is no indication that any of the plaintiffs were armed with anything more than "a small pocket knife" one of them carried in his pocket. *Id.* at 491-92. We nonetheless determined that the investigator's actions in pointing the gun did not constitute excessive force because of the "uncertainty of [plaintiff's] intentions and the escalation of activity involving the arrests." *Id.*

*Collins* demonstrates the nonexistence of a clearly established rule prohibiting Defendants' show of force. There is no dispute that LaDuke had at least one gun with him inside the house and refused to comply with police requests to provide identification or to exit the premises. The risk potential that he presented was thus far greater than the plaintiffs in *Collins*. And Plaintiff cites no other precedent stating that an individual armed with a gun, refusing to cooperate with police, has a right not to have guns pointed at him. To the contrary, our precedent appears to affirmatively suggest that when police officers have a reasonable fear for their safety, they may approach a subject with guns raised. *See United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) ("[When the] surrounding circumstances give rise to a justifiable fear for personal safety, a seizure

effectuated with weapons drawn may properly be considered an investigative stop." (alteration in original) (quoting *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986))) .

Plaintiff argues that there is no evidence that LaDuke actually held or carried a gun on his person at the time that SRT surrounded his residence with weapons raised. Although he is correct that officers did not have a visual of LaDuke holding a gun until the minutes directly proceeding the shooting, long after SRT officers had surrounded the house, they undisputably knew he had access to a gun in the home. They also knew that he was not cooperating with police. There is simply no clearly established rule prohibiting the Defendants' actions under these circumstances.

Accordingly, we affirm the district court's determination that Defendants were entitled to qualified immunity under the show of force theory.

## 2. Official Capacity Claim

Plaintiff also claims that Officer Fraddosio, acting in his official capacity as an SRT commander, "developed and endorsed a policy and practice whereby it was customary for SRT members under his command to be deployed into the field without adequate training" and that he "implemented a custom and practice of treating mental health crisis calls and/or barricaded subjects as if it were a hostage rescue," and "of responding and acting without an Operations Plan in [SRT] encounters with mentally distressed subjects." SAC, R.31, PageID #148-49. He claims that Officer "Fraddosio's development, endorsement, and implementation of these policies, customs, and practices was a substantial and contributing factor in the death of Desman LaDuke." *Id.* at PageID #149.

"Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (internal quotations omitted). Accordingly, to hold Officer Fraddosio liable in his official

capacity, Plaintiff must prove that (1) LaDuke suffered a constitutional deprivation, and that (2) that deprivation stemmed from a county policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022); *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1165 (6th Cir. 2021).

The district court dismissed the official capacity claim against Officer Fraddosio based on its conclusion that there was no underlying constitutional violation and thus did not reach the second part of the inquiry (the "*Monell* liability" component). On appeal, Plaintiff has advanced no arguments as to the *Monell* liability prong. He states merely that "because the individuals violated Desman's constitutional rights by both the excessive show of force and the excessive use of force, the court also erred in dismissing the § 1983 official capacity claim." Appellant Br. at 30.

Where a plaintiff challenges a municipal liability or official capacity claim on appeal but addresses only the constitutional violation question and not the *Monell* question, he generally waives the *Monell* argument. *Hardrick v. City of Detroit*, 876 F.3d 238, 244 (6th Cir. 2017); *see also Stanislaw v. Thetford Twp.*, 2025 WL 233215, at *5 (6th Cir. Jan. 17, 2025). In *Hardrick*, we considered a municipal liability claim where the plaintiff advanced no *Monell* arguments in his opening brief on appeal as "a function of grace, not entitlement" in part because the plaintiff raised *Monell* arguments in its reply brief. 876 F.3d at 244. Here, by contrast, Plaintiff made no effort to raise any *Monell* arguments in reply, and his discussion of the issue before the district court was extremely cursory. We thus apply the normal waiver rule and decline to consider Plaintiff's *Monell* arguments.

Accordingly, we conclude that Plaintiff has failed to raise even a *prima facie* official capacity claim against Officer Fraddosio, and we affirm the district court's grant of summary judgment on this issue.

### 3. Ministerial Duty Theory of Liability

Plaintiff also argues that the district court erred in declining to consider his argument that Defendants violated Kentucky state law by failing to follow the police department's Persons of Diminished Capacity policy in their handling of LaDuke.[2]  Plaintiff raised this "failure-to-follow-policy" argument for the first time in his response to Defendants' motion for summary judgment. However, at the pleading stage, he advanced a distinct theory of state law tort liability:  that Defendants used "unauthorized and unnecessary deadly force against [LaDuke] without legal right or justification."  SAC, R.31, PageID #147.

The district court made no error in declining to consider the new policy-based theory.  "A plaintiff may not shift its theory of liability at the summary judgment stage in a way that materially alters the pleaded factual basis of its claim and prejudices the opposing party."  *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Michigan*, 146 F.4th 496, 511-12 (6th Cir. 2025).  And Plaintiff's failure-to-follow-policy theory both materially altered the legal and factual basis for the state law claims and would have significantly prejudiced Defendants if considered by the district court.

Under the policy-based theory, Defendants would have been forced to answer whether (1) the Diminished Capacity policy contains ministerial versus discretionary duties, and (2) whether Horton and Fraddosio breached or were negligent in performing these duties in their response to

---

[2] It is not clear if Plaintiff was trying to allege the failure-to-follow policy theory to support all of his state law claims or only the negligence claim.  However, this distinction is not material to the outcome of this issue.

the incident and the hours preceding the shooting. *See Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001) (public officers receive immunity "for acts performed in the exercise of their discretionary functions," but are "afforded no immunity from tort liability for the negligent performance of a ministerial act."); *Patton v. Bickford*, 529 S.W.3d 717, 728 (Ky. 2016) ("Plaintiffs have the burden of establishing a *prima fa[cie]* case of negligence in the breach of the applicable ministerial duty."). By contrast, the state law negligence theory asked Defendants to respond to only whether they breached a duty to LaDuke in their use of force. *See Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 298 (Ky. 2015) ("The basic negligence tort" is comprised of "duty, breach, causation, damages."). These theories thus implicate significantly different factual and legal questions and Plaintiff's failure to raise the theory earlier robbed Defendants of the opportunity to "make arguments regarding the [failure-to-follow-policy] theory" in their summary judgment briefing or to develop evidence going to the same throughout discovery. *See Grand Traverse Band*, 146 F.4th at 512. Allowing Plaintiffs to pursue this theory not just at summary judgment but *in response* to Defendants' motion for summary judgment would have prejudiced Defendants.

Plaintiff contends that consideration of the new theory would not have prejudiced Defendants because they had notice of this theory prior to summary judgment. He contends that notice was provided because Plaintiff's complaint referenced the policy and Plaintiff solicited deposition testimony about the policy. That is plainly incorrect. The complaint only referenced what appears to be the Diminished Capacity policy in two paragraphs early in the complaint where it states that "Fraddosio was responsible for ensuring that SRT members . . . followed policies/rules/General Orders/standard operating procedures," "includ[ing] the Department's General Orders relating to dealing with Persons of Diminished Capacity/Mentally Ill." SAC, R.31,

PageID #132.[3]   But these brief and nonspecific references to the policy do not provide notice that Plaintiff would advance a failure-to-follow-policy theory to support his state law claims—indeed, the complaint never mentioned the policy when describing the bases for the state law claims. Similarly, the fact that Plaintiff asked some witnesses questions relating to the Diminished Capacity Policy was not enough to put them on notice that he would use the policy-based theory to support his state-law claims.  Factual development about a particular topic is not enough to alert your opponent that you will change the theory of one of your claims at summary judgment.  *See Grand Traverse Band*, 146 F.4th at 512-13.

The district court thus made no error in declining to consider Plaintiff's failure-to-follow-policy theory.

### 4.   Motion to File a Third Amended Complaint

In another attempt to belatedly pursue the failure-to-follow-policy theory, Plaintiff moved to file a third amended complaint after the district court entered summary judgment for Defendants. The district court denied the motion, and Plaintiff argues that this was an error.  Reviewing the district court's decision for abuse of discretion, we affirm.  *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833–34 (6th Cir. 1999).

Generally, "leave to amend" a complaint should be "freely given" if the "underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, the district court may decline to allow the filing of an amended complaint in cases of  "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

---

[3] Plaintiff cites several other paragraphs on the SAC that he contends contain allegations relating to the Diminished Capacity Policy.  *See* Appellant Br. at 31.  However, none of these additional paragraphs explicitly reference the Policy—they simply reference failure to "policies" more generally.

to the opposing party by virtue of allowance of the amendment, futility of amendment" or other similar reasons. *Id.* We have held that, to deny a motion to amend, a court must find "at least some significant showing of prejudice to the opponent." *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986) (per curiam). When a plaintiff moves to amend his complaint at a late stage in the litigation—for instance, after the "discovery deadline and the dispositive motion deadline ha[s] passed"—he faces "an increased burden . . . to show justification for the failure to move earlier." *Duggins*, 195 F.3d at 834.

Considering the circumstances of this case, it was appropriate for the district court to deny Plaintiff's request to file a third amended complaint. Plaintiff "was obviously aware of the basis of the" failure-to-follow-policy theory for years, "especially since some underlying facts were made a part of the complaint," yet he "delayed pursuing this [theory] until after discovery had passed, the dispositive motion deadline had passed, and a motion for summary judgment had been filed." *Id.* Plaintiff has provided no justification for this delay. Moreover, the court had already provided Plaintiff with two opportunities to file amended complaints, and both of those times Plaintiff failed to add the failure-to-follow policy theory. Our precedent clearly states that, in scenarios like this, "[a]llowing amendment . . . would create significant prejudice to the defendants in having to reopen discovery and prepare a defense for a claim quite different from the . . . claim that was before the court." *Id.*

We thus affirm the district court's decision to deny Plaintiff's request to file an amended complaint.

## IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** the court's grant of summary judgment to Defendants.

**NALBANDIAN, Circuit Judge, concurring in part and concurring in the judgment.**

I agree that we should affirm the district court. But I write separately with two slight disagreements with the majority. First, I'm not convinced that Norman forfeited his official-capacity claim on appeal. But it's plain to me that he can't prevail in any event. And second, I wouldn't ignore Rule 59(e) when evaluating Norman's post-judgment request to file an amended complaint.

First, the official-capacity (or *Monell*) claim. To prove a *Monell* claim, a plaintiff must establish two elements: (1) he suffered a constitutional violation; and (2) a municipal policy or custom directly caused the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978); *Baynes v. Cleland*, 799 F.3d 600, 620–21 (6th Cir. 2015). At summary judgment, the parties addressed both elements in their briefing, with Norman rooting the claim on a failure-to-train theory. The district court granted judgment to the defendants based on the first element without addressing the second. So Norman's opening brief discussed only how the district court's *Monell* ruling couldn't stand because it should've held that a constitutional violation occurred—an argument derived from his individual-capacity claims that didn't need much independent explanation.

The majority says that Norman's approach equals forfeiture, relying on *Hardrick v. City of Detroit*, 876 F.3d 238 (6th Cir. 2017). *See* Maj. Op. at 12–13. To be fair, *Hardrick* matches what happened here. In *Hardrick*, the district court had rejected the appellants' *Monell* claim based only on the ground that no constitutional violation occurred. 876 F.3d at 243. And we said that the appellants forfeited the entire claim on appeal by not making an argument about municipal policy in their opening brief. *Id.* at 244.

But I'm hesitant to embrace *Hardrick*'s reasoning in this context because the upshot of that reasoning is that an appellant must address alternative grounds for affirmance of a judgment without knowing whether the appellee intends to raise them. That doesn't seem aligned with other published cases of this circuit. *See, e.g.*, *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 727 n.4 (6th Cir. 2017) ("'[T]here is no waiver' when a party 'respond[s] to the alternative basis for affirmance raised on appeal.'" (quoting *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 729 (6th Cir. 2012))). Nor does it align with standard appellate practice as recognized by other circuits. *See, e.g.*, *Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 729 (9th Cir. 2021) ("[The appellee] is thus wrong to suggest than an appellant must address all *possible* alternate grounds for affirmance—even those not ruled upon by the district court—in an opening brief."); *United States v. Brown*, 348 F.3d 1200, 1212–13 (10th Cir. 2003) ("[W]e reject [the appellee's] suggestion that [the appellant] waived its right to respond to these (and other) arguments when it did not discuss them in its opening brief" because the "arguments do not relate to the basis of the district court's ruling."); *Walker v. Exeter Region Coop. Sch. Dist.*, 284 F.3d 42, 47 (1st Cir. 2002) ("The district court did not reach the second ground, and therefore plaintiffs had no obligation to address the issue in their opening brief.").

Perhaps there's something unique about *Monell* liability. One might say that the core of a *Monell* claim is showing that the municipality caused the constitutional violation rather than the violation resulting solely from an employee's misfeasance. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). So because an appellant's failure to brief the second element means that the appellant ignored the core of the claim, maybe we treat that failure more harshly. That would mean that *Hardrick* is limited in its application to cases involving *Monell* liability.

But *Hardrick* didn't indicate anything to that effect. Instead, it cast its reasoning in general terms: "Appellate courts 'review[] judgments, not opinions.'" *Hardrick*, 876 F.3d at 244 (quoting *Texas v. Hopwood*, 518 U.S. 1033, 1034 (1996) (denying a petition for writ of certiorari because the petitioners challenged just the reasoning of the Fifth Circuit and not its judgment)). That is true. But the district court identified only one basis for its holding on *Monell* liability: the absence of a constitutional violation. So Norman's opening brief supplies enough to vacate the judgment and remand.

As I see it, when a district court identifies only one basis for its holding, an appellant needs to challenge that basis in his opening brief. He doesn't need to address every possible alternative basis for affirmance. Litigators "must select what is important and deal only with that." *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 359 (7th Cir. 1987) (Posner, J., separate opinion). Everything else should be "ruthlessly discarded." *Id.* By requiring an appellant "to anticipate and rebut in his opening brief every possible ground for affirmance that the defendant might (or might not) raise," we are telling litigators to take a scattershot approach—the opposite of focused appellate advocacy. *Id.*

The majority suggests that Norman's approach is even worse than what the appellant in *Hardrick* did. *See* Maj. Op. at 12. Here, Norman doesn't address the second *Monell* element in his reply brief. But I'm not convinced that the defendants actually raise an alternative ground for affirmance—though, admittedly, it's hard to tell. Unlike the appellees in *Hardrick*, the defendants don't attack the alleged municipal policy that Norman presented to the district court. *Compare* Appellee Br. at 33–34, *with* Appellee Br. at 38–42, *Hardrick v. City of Detroit*, 876 F.3d 238 (6th Cir. 2017) (Nos. 16-2704/17-2077), Dkt. No. 21. Instead, I read their brief as asserting merely that Norman forfeited the *Monell* claim on appeal. Citing Norman's opening brief, the defendants

claim that Norman "has not argued that any policy, custom, or practice was the moving force behind the constitutional violation." Appellee Br. at 34. That statement can be true only if the defendants are referring to Norman's appellate argument, because Norman did, in fact, present a failure-to-train theory of municipal liability at summary judgment. And the defendants understood the theory well enough to respond to it on the merits. So the defendants insist on forfeiture, not an alternative basis for affirmance.

In sum, none of the procedural resolutions of Norman's *Monell* claim are satisfying. Still, we should affirm the district court because the claim fails on the merits.

Granting qualified immunity to Officers Horton and Fraddosio based on the absence of a clearly established right means that Norman's *Monell* claim fails as well. He asserts a failure-to-train theory based on a single violation of federal rights. That means he must show that it's "obvious that the failure to train will lead to certain conduct" and that it's "obvious (i.e., clearly established) that the conduct will violate constitutional rights." *Martinez v. Wayne County*, 142 F.4th 828, 844 (6th Cir. 2025) (quoting *J.H. v. Williamson County*, 951 F.3d 709, 721 (6th Cir. 2020)). So "the absence of a *clearly established* right spells the end of the *Monell* claim." *Id.* (citation modified) (quoting *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017)).

Second, I would clarify that the threshold inquiry for a plaintiff's post-judgment request to file an amended complaint is under Federal Rule of Civil Procedure 59(e). *See* 6 Wright & Miller's Federal Practice & Procedure § 1489 (3d ed. 2026) ("Most courts . . . have held that once a judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or 60."). As I understand the majority opinion, it applies just the Rule 15 standard. *See* Maj. Op. at 15–16. Though I agree that the district court didn't abuse its

discretion in rejecting Norman's request to file a third amended complaint, Norman moved to amend his complaint after the district court had entered final judgment on all claims. And "that makes a difference." *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 563 (6th Cir. 2022).

"When a party seeks to amend a complaint after an adverse judgment," he must "meet the requirements for reopening a case established by Rule[] 59." *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010); *see also Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002) ("Following entry of final judgment, a party may not seek to amend their complaint without first moving to alter . . . [the] judgment" under Rule 59.). And under Rule 59, the court alters the judgment based on "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Gen. Motors*, 44 F.4th at 563 (citation modified). This is a "heavier burden" for the movant compared to Rule 15's burden. *Leisure Caviar*, 616 F.3d at 616. At the same time, we've noted that post-judgment "Rule 15 and Rule 59 inquiries turn on the same factors." *Id.* (quoting *Morse*, 290 F.3d at 799). And when assessing post-judgment motions to file an amended complaint, sometimes we've focused on the Rule 15 standard. *See Morse*, 290 F.3d at 800–01. Other times, we've used Rule 59's rubric. *See Gen. Motors*, 44 F.4th at 563–65 (assessing whether the movant pointed to newly discovered evidence).

In any event, Plaintiff can't surpass Rule 15 or Rule 59 here. Indeed, it may be a rare case that post-judgment Rule 15 and Rule 59 inquires will point in different directions. So generally we can skip ahead and evaluate just Rule 15's standard if the movant cannot best it. But keeping the inquiries distinct will, in addition to helping parties present their arguments, ensure that we don't "sidestep the narrow grounds for obtaining post-judgment relief under Rule 59" and turn Rule 59 into a "nullity." *Leisure Caviar*, 616 F.3d at 616 (citation modified).

In all other respects I join the majority opinion and agree that we should affirm the lower court's judgment.